OGLESBY v. MISSOURI PACIFIC RAILWAY COMPANY, Appellant.

In Banc, May 30, 1899.

150   137
  91a 528

150      137
  98a ² 29

150      137
  98a ¹501

150     137
177     285
j177    305

1. **Negligence**: PLEADING: TWO CAUSES STATED. If a petition founded on negligence states two acts, each constituting negligence and either sufficient in itself to sustain the cause of action, if there be proof to sustain the one and no proof to sustain the other, the action will not fail after verdict. (Per VALLIANT, J.; GANTT, C. J., BURGESS and BRACE, JJ., concurring.)

2. ——: ——: ——: NO DEMURRER. And if one of the acts charged as negligence is not, under the law, such negligence as defendant is liable for, and he waits until after verdict before raising objection thereto, he will not then be heard if by a liberal construction of the petition it is found sufficient to sustain the verdict.

3. ——: ——: ——: ——: CASE STATED.  So that where the petition charges that plaintiff's injury is due to defendant's negli. gence in two particulars, namely, in placing a defective car in its freight train, and in running the train at a dangerous speed, and the evidence shows that a fellow servant of the plaintiff is responsible for the rate of speed and that it was not dangerous, and the other is a cause for which the common carrier is responsible to plaintiff if established by the evidence, and no demurrer to the petition or motion to strike out was offered, and the instructions practically eliminated the question of dangerous speed from the case, a demurrer to the evidence should not be sustained because these two grounds of negligence were joined together as part of one allegation, there being substantial evidence that the car was defective and that its defective condition caused the accident.

4. ——: DEFECTIVE CAR.  The evidence in this case that the accident was caused by a defective car, that defendant knew or by the exercise of ordinary care should have known its condition, and that the accident resulted in plaintiff's injury without his fault, is held sufficient to take the case to the jury. (Per VALLIANT, J.; GANTT, C. J., BURGESS and BRACE, JJ., concurring.)

5. ——: DAMAGES: EXCESSIVE: LIMIT FIXED BY COUNSEL.  The counsel for plaintiff in his closing argument to the jury said: "Gentlemen of the jury, it is not for me to say how much, but I think he ought to have a liberal judgment, and in my humble opinion twelve thousand dollars is not too much." The award was $15,000. *Held*, that the size of this verdict did not, in the light of the counsel's remarks, indicate that it was the result of passion or prejudice. Nor was the verdict, under the circumstances of the case, excessive. (Per VALLIANT, J.; GANTT, C. J., BURGESS and BRACE, JJ., concurring.)

6. ——: INSTRUCTION: LEGAL PROPOSITIONS.  It is the province of the court to instruct the jury only upon legal propositions.

7. ——: ——: INSPECTION OF CARS.  An instruction that sub. stitutes the company's "ordinary inspection" of cars, for the "law's ordinary care" is vicious.  (Per VALLIANT, J.; GANTT, C. J., and BRACE, J., concurring.)

8. ——: ——: ——: PRESUMPTION.  There is no presumption that a railroad company's inspectors did their duty in inspecting cars, nor is the burden on plaintiff to show that they failed to do so.  On the contrary when the evidence shows that a brakeman is injured by a defective car, the burden is on the railroad to show that it exercised the ordinary care in inspecting the cars that the law requires.  (Per VALLIANT, J.; GANTT, C. J., and BRACE, J., concurring.)

Oglesby v. Mo. Pac. R'y Co.

## Separate Opinion Per MARSHALL, J.

1. **Negligence**: DEFECTIVE CAR: EVIDENCE OF INSPECTION. There was no evidence that the car was not properly inspected, and want of proper inspection was the only act of negligence upon which plaintiff could predicate a recovery under the facts disclosed by the record in this case.

## Separate Opinion Per SHERWOOD, J.

1. **Railroads**: INJURIES TO EMPLOYEE: HIDDEN DEFECTS: INSPECTION. A railroad company is not liable to a brakeman for personal injuries incurred in a wreck caused by rotten sills in a freight car belonging to another company, where it was ignorant of the defect, and had made such an inspection of the car as a man of ordinary prudence would have made under the circumstances.

2. ———: ———: ———: ———: PRESUMPTION. In an action for such injuries, an inspection proven to have been made by the company will be presumed to have been a proper one, in the absence of evidence to the contrary.

*Appeal from Bates Circuit Court.*—HON. JAMES H. LAY, Judge.

REVERSED AND REMANDED.

R. T. RAILEY and MARTIN L. CLARDY for appellant.

(1) Where the testimony shows that the injury complained of, could have happened in more than one way, and there is no testimony showing how it did occur, then it becomes a matter of conjecture, and, as the burden of proof devolves upon the plaintiff to establish negligence affirmatively, he failed to make out a case, and the court should have accordingly directed a verdict for defendant. 1 Greenl. on Evid. (15 Ed.), sec. 11; Perkins v. Railroad, 103 Mo. 58; Wintuska's Admr. v. Railroad, 20 S. W. 820; Hughes v. Railroad, 16 S. W. 276; Hayes v. Railroad, 97 N. Y. 262; Baulec v. Railroad, 59 N. Y. 336; Schertle v. Railroad, 2 A. & E.

R. R. Cas. 161; Orth v. Railroad, 50 N. W. 363; Briggs v. Railroad, 53 N. W. 1019; Peck v. Railroad, 31 Mo. App. 123. (2) The statement made by the plaintiff's counsel in his concluding argument to the jury reads: "Gentlemen of the jury, it is not for me to say how much, but I think he ought to have a liberal judgment, and in my humble opinion $12,000 is not too much." The declaration thus made by counsel for plaintiff in his concluding argument before the jury, stands as though the plaintiff had risen before the jury and declared to them that, under the evidence, he was not entitled to a verdict of more than $12,000. Under the law of this State, the plaintiff is represented by his counsel, and the counsel addresses the jury in behalf of his client. Whatever, however, the attorney may say in his concluding argument before the jury in behalf of his client, occupies the same position legally as though the plaintiff himself had declared what the counsel said. It is, furthermore, the settled law that whatever the counsel, under the circumstances aforesaid, may say is binding on his client. Gehrke v. Jod, 59 Mo. 522; Field v. Matson, 8 Mo. 688; Miller v. Bernecker, 46 Mo. 196; Walsh v. Railroad, 102 Mo. 588. (3) The concluding argument of the plaintiff's counsel heretofore set out, conclusively sustains this contention. We therefore insist that in a case where the plaintiff has sued for damages greatly in excess of that which he is entitled to recover, that the court should not instruct the jury that under the evidence, if they find for plaintiff, they may return the verdict for any sum within the amount claimed in petition. This is in legal effect, telling the jury that, in the estimation of the court the evidence, in the case, if they find for the plaintiff, would warrant a verdict for any sum up to $25,000. This is not the law. Bryan v. Acee, 27 Ga. 87; Glasscock v. Shell, 57 Tex. 224; Willis & Bro. v. McNeill, 57 Tex. 478; Fordyce v. Nix, 23 S. W. 967.

O. L. HOUTS for respondent.

(1) The demurrer to the evidence was properly over-ruled. The evidence not only tended to show, but it was clearly proven by the great weight of the evidence, that this Union Line car was rotten and unfit for service; that defendant could have known its condition by reasonable inspection and that the use of this rotten car by defendant was the cause of the wreck of the train and the injury to plaintiff. This not only compelled the trial court to submit the case to the jury but entitled plaintiff to a verdict. Parsons v. Railroad, 94 Mo. 286; Gorham v. Railroad, 113 Mo. 408; Gutridge v. Railroad, 94 Mo. 468; Gutridge v. Railroad, 105 Mo. 520; Condon v. Railroad, 78 Mo. 567; Settle v. Railroad, 127 Mo. 336. Defendant did not offer a demurrer at the close of plaintiff's testimony and must have then believed that plaintiff had made a case. Defendant's suggestion that the train was running at an excessive rate of speed, and caused plaintiff's injury is squarely contradicted by the record, and by that part of the record made by defendant. Defendant proved by the uncontradicted testimony of the crew of the train that it was running twenty or twenty-two miles an hour, a reasonable rate of speed. At the request of defendant the court instructed the jury "that defendant was guilty of no negligence in running said train at the rate of speed disclosed by the evidence." (2) There was no error in giving plaintiff's instruction on the measure of damages. The instruction is drawn from one approved by this court in Russell v. Columbia, 74 Mo. 480. That case has been often cited and followed and instructions in substance the same many times approved. Gorham v. Railroad, 113 Mo. 408; Rodney v. Railroad, 127 Mo. 676. The instruction is not bad because it does not permit the jury to give a verdict for a greater sum than that asked by the pleadings. Wright v. Jacobs, 61 Mo. 19; Gorham v. Railroad, 113 Mo. 408.

(3) The verdict of the jury is not excessive. The amount of damages in a case of this kind must be left largely to the discretion of the jury, and their verdict ought not to be reversed unless the amount is so gross as to shock the sense of justice of the judicial mind, and satisfy it that such verdict was the result of passion, prejudice or partiality. This is the rule of this court. Rodney v. Railroad, 127 Mo. 676; Hollenbeck v. Railroad, 34 S. W. 494; Dowd v. Air Brake Co., 132 Mo. 579.

R. T. RAILEY and MARTIN L. CLARDY for appellant on motion for rehearing.

(1) Defendant's inspectors were guilty of no negligence in respect to performing their duty. Defendant's instruction numbered 5, is abundantly supported by the law in this State as well as elsewhere. Mackin v. Railroad, 135 Mass. 206; Thomas v. Railroad, 109 Mo. 187; Baldwin v. Railroad, 50 Ia. 680; Ballou v. Railroad, 54 Wis. 257; DeGraff v. Railroad, 76 N. Y. 131; Krampe v. Railroad, 59 Mo. App. 277; Moss v. Railroad, 49 Mo. 167; Murphy v. Railroad, 71 Mo. 202; Roblin v. Railroad, 119 Mo. 484. (2) The mere fact that certain defects were found in the car after the wreck, as disclosed by the freshly broken places, does not make a *prima facie* case of negligence against the inspectors. 3 Elliott on Railroad, sec. 1308; McPadden v. Railroad, 44 N. Y. 480; Sherman and Redfield on Neg. (3 Ed.), sec. 87; Wood's Law of Master and Servant (2 Ed.), sec. 419; Pierce on Railroads, 383; 2 Rorer on Railroads, pp. 1200, 1201; Krampe v. St. L. B. A., 59 Mo. App. 283; Moss v. Railroad, 49 Mo. 170; Murphy v. Railroad, 71 Mo. 202; Roblin v. Railroad, 119 Mo. 484; Sack v. Dolese, 27 N. E. 64. (3) We have shown from the undisputed evidence that the wreck more than likely occurred by reason of the rapid rate of speed at which the train was run. The motive for running it rapidly appears from the testimony of Butts

and Hessler. Both testified that the train was two hours late. The conductor says that they were trying to make a side-track ahead of the passenger train. The plaintiff's evidence shows that they were running close on passenger train time. The plaintiff swears that he noticed the engineer did not shut off his steam, as he generally did; that he looked back and saw the middle brakeman about four cars from the caboose, with his hands behind him; that he did not seem to make any motion to set brakes, and did not set any brakes; and that plaintiff did not set any brakes until he got down, and that he noticed the train was running too fast. It is likewise alleged in the petition that the train was run at a rapid and dangerous rate of speed. These facts are to be taken as true against plaintiff. Bruce v. Sims, 34 Mo. 251; Speck v. Riggin, 40 Mo. 406; Capital Banks v. Armstrong, 62 Mo. 65; Chapman v. Callahan, 66 Mo. 312; Donnan v. Pub. Co., 70 Mo. 175; Kuhn v. Weil, 73 Mo. 215; Weil v. Posten, 77 Mo. 287; Wilson v. Albert, 89 Mo. 546; Bensieck v. Cook, 110 Mo. 182. (4) The presumption of law being that the inspectors did their duty, and the court having so instructed the jury, there was not a scintilla of evidence to overcome the presumption and the plaintiff should have been nonsuited. The cause was submitted to the jury in view of the undisputed evidence in regard to the defects; the car breaking down before it left the track; in regard to the inspection; in regard to the ability of the car to carry the load, notwithstanding the defects, purely upon conjecture, without a scintilla of substantial evidence upon which to predicate the verdict. Railroad v. Shertle, 97 Pa. St. 450; Wintuska's Admr. v. Railroad, 20 S. W. 820; Megow v. Railroad, 56 N. W. 1099; Duncan v. W. U. Tel. Co., 58 N. W. 75; Orth v. Railroad, 50 N. W. 364; O'Malley v. Railroad, 113 Mo. 325; Perkins v. Railroad, 103 Mo. 52; Peck v. Railroad, 31 Mo. App. 125; Glick v. Railroad, 57 Mo. App. 105; Moore v. Railroad, 28 Mo. App. 625; Hughes

v. Railroad, 16 S. W. 275; Cotton v. Wood, 8 C. B. (N. S.), 568; Hays v. Railroad, 97 N. Y. 259; Baulec v. Railroad, 59 N. Y. 366. (5) This court is unauthorized, under the decisions of this State, to fall back upon the conduct of the court below, in refusing to require a remittitur, as the cause in said court was tried upon the express theory that this court would require a remittitur. This case was tried upon the law as it then existed, and it was so appealed to this court. This court, for more than forty years, has without the slightest hesitation, in cases of this character, reversed the lower court and remanded the case for a new trial. Judge Elliott says: "It is inconceivable that a high court of justice, such as an appellate tribunal, may not, upon an investigation of the record, so frame its judgment as to prevent the defeat of justice by technical and arbitrary rules. The denial of this right involves the affirmation that the highest courts can not award justice, and this conclusion can not be vindicated, since the underlying and sovereign principle is that the right of appeal insures to litigants who have obeyed the substantive rules of law and conformed to the rules of procedure a judgment awarding them justice under the laws of the land. It must be true, therefore, that a high appellate tribunal may deliver and enforce a judgment that will prevent wrong and award justice to the parties entitled to it." This principle is clearly supported by the following authorities: Goetz v. Ambs, 22 Mo. 172; Kinealy v. Macklin, 67 Mo. 98; R. S. 1889, sec. 2304; Bridle v. Grau, 42 Mo. 360; Hunt v. Railroad, 89 Mo. 608; Carroll v. Railroad, 107 Mo. 664; Whitsitt v. Ransom, 79 Mo. 260; Garrett v. Greenwell, 92 Mo. 125; Caruth v. Richeson, 96 Mo. 192; Spohn v. Railroad, 87 Mo. 74; State v. Primm, 98 Mo. 372; Spohn v. Railroad, 116 Mo. 635; Adams v. Railroad, 100 Mo. 570; Gurley v. Railroad 104 Mo. 233; Fretwell v. Laffoon, 77 Mo. 33; Lilly v. Menke, 126 Mo. 222; Scott v. Smith, 133 Mo. 623; Ettlinger v. Kahn, 134 Mo. 498; Kelsay v. Railroad, 129 Mo. 376.

O. L. Houts for respondent in reply.

(1)   In the light of the evidence, defendant's counsel makes some startling declarations.   (a)   It is said that there is no evidence tending to show that this car, where broken, had fallen upon the track and had plowed into the ground and track, that the breaks in the sills were square off without splitting, that the sills of the car were doty, worm-eaten and rotten or that their condition was manifest to one making examination, or that the breaking of the car caused the wreck and injury to plaintiff.   The evidence makes sufficient answer to all these statements.   (b)   In support of motion for rehearing and repeatedly all through his brief, defendant's counsel complains that "no witness ever testified that by ordinary inspection as the car stood in the train or before put in the train, it could have been observed that it was unfit for use or defective," and that no witness was ever asked whether, by ordinary and reasonable inspection, defendant could have discovered the rotten condition of the car, and whether in the opinion of any witness the rotten condition of the car would have caused the wreck.   It would have been error for plaintiff to have asked these questions if the court had permitted them to be answered.   It was competent for the witnesses to describe the condition of the car and for the jury to determine whether it caused the wreck and whether its condition could have been discovered by defendant by reasonable inspection.   (2)   Defendant's counsel has filed three briefs in this case, in which he has sought, at great length, to show that the damages are excessive; yet he has not one time referred to the nature and extent of plaintiff's injuries.   The reason is obvious.   The facts themselves speak.   Their simple recital, as disclosed by the cold record alone, shows that the plaintiff has sustained the gravest injuries, rendering him a physical wreck

in the very beginning of a life that promised to be a successful one. In few of the reported cases have the injuries been so severe, because few persons have survived such injuries. In view of the facts in this case, the damages are not excessive. (3) This right to determine questions of fact is vested in juries by law and because they are in a position to best determined facts. This fact is of special advantage to juries in estimating damages for personal injuries. By personally observing the injured person, they can better ascertain the effect of the injuries upon him and, in some degree, then determine the extent of the mental and physical suffering that he has endured and will experience in the future. They can ascertain what manner of person he was and what he might have been, his possibilities and prospects in life. This is especially true in this case where plaintiff, a boy of nineteen years, who had not reached the time of life when he would have secured a fixed income or salary and when some computation could be made as to what his future earnings would be. Railroad v. Elliott, 149 U. S. 268. The trial judge has the same opportunities as the jury, and the trial to him is a living reality. For this reason he is given a superintending control over the verdict of the jury. Lincoln v. Power, 151 U. S. 436; Parsons v. Bedford, 3 Peters 448; Railroad v. Fraloff, 100 U. S. 31. This, it is believed, is the effect of the recent decisions of this and other courts. Hollenbeck v. Railroad, 38 S. W. 723; Rodney v. Railroad, 127 Mo. 678; Dowd v. Air Brake Co., 132 Mo. 579; Hovey v. Brown, 59 N. H. 114; Chicago Cab Co. v. Havelick, 131 Ill. 179; Vallo v. Express Co., 147 Pa. St. 404; Gates v. Railroad, 76 N. Y. 594; Pitchard v. Hewitt, 91 Mo. 547. (4) Compared with the injuries sustained, the courts have sanctioned much larger recoveries. Waldhier v. Railroad, 87 Mo. 38; Dougherty v. Railroad, 97 Mo. 648; Porter v. Railroad, 71 Mo. 74; Klutts v. Railroad, 75 Mo. 649; Pritchard

Oglesby v. Mo. Pac. R'y Co.

v. Hewitt, 91 Mo. 550; Whalen v. Railroad, 60 Mo. 323; Griffith v. Railroad, 98 Mo. 163; Sheehey v. Railroad, 94 Mo. 580; Dimmitt v. Railroad, 40 Mo. App. 654; Furnish v. Railroad, 102 Mo. 438; Railroad v. Moore, 31 Kan. 197; Funston v. Railroad, 61 Ia. 453; Railroad v. Thompson, 64 Miss. 585; Rockwell v. Railroad, 64 Barb. 438; Railroad v. Burring, 51 Ga. 589; Berg v. Railroad, 50 Wis. 419; Solen v. Railroad, 13 Nev. 137; Belair v. Railroad, 43 Ia. 676; Harrold v. Railroad, 24 Hun. 184.

### SEPARATE OPINION.

VALLIANT, J.—This is a suit for damages for personal injuries sustained in the wreck of a freight train of defendant, by plaintiff who was a brakeman on the train.

The petition states substantially that defendant railroad company was the owner of a line of railway, engines and trains of cars, and engaged in operating the same between Kansas City and St. Louis, and plaintiff was in the service of defendant as brakeman on a freight train that started from Kansas City on December 11, 1892, bound for St. Louis; the defendant negligently furnished and placed in the train "a car numbered 7919, with the initals 'U. L.' thereon, which was at the time unfit for service, unsafe, old, worn and out of repair, and the timbers of which were decayed and rotten, and which was by defendant overloaded, and improperly loaded, and caused and permitted said train to be run at a rapid and dangerous rate of speed;" that defendant knew or by the exercise of ordinary care might have known the condition of the car; that because of this condition and of the rapid and dangerous rate of speed at which the train was run, the car broke, the train was wrecked, and the plaintiff while in the line of his duty and without fault on his part was thrown into the wreck and seriously injured.

The answer was a general denial.

The cause was tried July 2, 1894, in the circuit court of Bates county.

The testimony on the part of the plaintiff tended to show that the train left Kansas City December 11, 1892, about 9:35 a. m. There were eighteen cars in the train, of which this U. L. No. 7919, was the one next to the engine; there were three brakemen, of whom plaintiff was the one most forward; when the train reached a point near what is called Little Blue switch, in Jackson county, it was wrecked; when the crash was over and the wreck was accomplished, this was the condition of things, to wit: the engine, except the two front small wheels, was off the track, the tender was off, this front car was broke in two, one part, being about one-third of it, was still coupled to the tender and was off to the right of the track; the other part was still on the track, the front end of this rear part having fallen down and plowed into the ties; the space between these severed parts of the car was seventy to eighty feet; nearly all of the other cars to the rear of this one, were crushed and broken, some of them falling to the right and some to the left of the track; a few of the cars in the rear were not broken; plaintiff was found under one of the wrecked cars, his right leg crushed and broken, his left mangled and torn, and other wounds; the plaintiff's testimony also tended to show that this front car was loaded with flour in barrels; that it was an old car, several of its sills were rotten and worm-eaten, and they appeared to have broken squarely in two or nearly so; the iron truss rods that ran the length of the car had not broken, but the ends which were held with nuts had pulled out at the rear end, pulling the nuts through the cross sills, the rods remaining with the front part of the car which was attached to the tender.

It was stipulated by the parties that this car, U. L. 7919, was received in Atchison, Kansas, December 5, 1893, having come over defendant's road from St. Louis loaded

with 31,300 pounds of nails, and it remained in Atchison in defendant's possession, unloaded from that date until December 10, 1893.

The testimony on part of defendant tended to show that the car was sound, in good condition, and comparatively new; that it was built to carry 60,000 pounds, and at the time of the wreck was loaded with 30,000 pounds of barreled flour; that it was inspected at Atchison and Kansas City, and no defect was noticed; that the train, which consisted of eighteen cars, with the U. L. 7919 car in front, was running at the rate of twenty to twenty-five miles an hour; that when the engine stopped it was from one hundred to two hundred yards from the wrecked cars.

At the close of the whole case defendant demurred to the evidence, the court overruled the demurrer and defendant excepted.

At the request of plaintiff the court instructed the jury as follows:

"1. The court instructs the jury that if you believe from the evidence in this case, that, at the time of the wreck of the defendant's train, the timbers of the car, No. 7919, Union Line, mentioned in evidence, were rotten and decayed and that, by reason thereof, the said car was not in a reasonably safe condition for use in defendant's said train; and that defendant knew of, or by the exercise of ordinary care might have known of the condition of said car; and that by reason of the said condition of said car, if the jury believe from the evidence it was in such condition, the said car broke and the said train was wrecked, and plaintiff while in the line of his employment and without fault on his part, was injured thereby, the jury must find for the plaintiff.

"2. If the jury find for the plaintiff, in estimating his damages, they will take into consideration, not only his age and condition in life, the physical injury inflicted, and the bodily pain and mental anguish endured, but also any and all

such damages, if any, which it appears from the evidence will reasonably result to him from said injury in the future, not to exceed in all the sum of $25,000."

And at the request of defendant the court gave the jury the following instructions:

"1.   Even if the jury should find from the evidence that said Union Line car 7919 was the first one of the train to leave the track, still this, in and of itself, does not prove that said car was unsafe, unsound or improperly loaded.

"2.   It is further charged in petition that said train on which plaintiff was injured was run at a rapid and dangerous rate of speed; you are instructed that defendant was guilty of no negligence in running said train at the rate of speed disclosed by the evidence.

"3.   Even if the jury should find and believe from the evidence that some portion of said car, 7919 Union Line, after the accident, appeared to be unsound and defective, yet the plaintiff is not entitled to recover herein unless the jury believe and find from the preponderance of the evidence, that said defects were known to defendant prior to said accident, or by the exercise of ordinary care upon its part, said defects or unsoundness could have been discovered by ordinary inspection upon the part of said defendant.

"4.   Ordinary care, as used in these instructions, means such care as an ordinarily prudent person would exercise under the circumstances detailed in evidence.    If, therefore, the jury believe from the evidence that defendant through its proper servant or servants, after having received said Union Line car 7919, for the transportation of flour mentioned in evidence, inspected the same at Atchison, Kansas, then the presumption is that said servant exercised ordinary care in the inspection of said car and did his duty; and it devolves upon plaintiff to show by a preponderance of the evidence that said defendant failed to exercise ordinary

care in inspecting said car; and unless the jury shall find from the evidence that said plaintiff has overcome the presumption aforesaid by the greater weight of all the testimony, it should find the issues herein in favor of defendant, notwithstanding said car may have been defective, and by reason thereof caused the injury to plaintiff.

"5.　Even if the jury should find from the evidence that said Union Line car 7919, was the first one on the train to leave the track; that it was unsound; that it caused the wreck and plaintiff's injury still, unless the jury believe from the greater weight of the evidence that defendant's servants failed to exercise ordinary care in inspecting said car before the accident, their verdict should be for the defendant. The jury are further instructed in this connection that in the absence of any evidence to the contrary, the law presumes that the servants of defendant who inspected said car performed their duty properly.

"6.　The court instructs the jury that defendant was not required under the law, upon receipt of said Union Line car 7919, to make tests to discover hidden defects in the construction or in the materials used in the construction of said car.

"7.　If the jury believe from the evidence that there was nothing patent upon the face of said Union Line car 7919, indicating that it was unsound and unfit for use; and that there was nothing to indicate upon reasonable inspection of same by the servants of defendant that said car was unsound and unfit for the use to which it was then put in transporting said flour, then your verdict must be for defendant, notwithstanding you may also believe that said car was unsound, and that said unsoundness caused the wreck which resulted in plaintiff's injury.

"8.　The jury are further instructed that defendant was not bound to furnish to plaintiff absolutely safe appli-

ances and cars with which to work, but was only required to use ordinary care in inspecting this and other foreign cars which came upon its road, so as to ascertain whether any defect or unsoundness appeared thereon which were open to inspection and which could be ascertained by ordinary inspection of same.

"9.   You are further instructed that in considering the charges of negligence against defendant, you are confined solely to said Union Line car 7919, and can not consider any other supposed negligence which may have caused the injury to plaintiff.

"10.   The court instructs the jury that defendant was guilty of no negligence in running its train at the rate of speed at which it was run at the time of the accident.    If the jury are unable to determine from the evidence whether said Union Line car 7919 caused plaintiff's injury, or whether it occurred from some other source, then it is your duty to return a verdict for defendant, as the burden of proof herein devolves upon the plaintiff.    Even if the jury should find and believe from the evidence that said Union Line car 7919 was the first car which went off defendant's track, yet this does not prove that said car was unsound or defective, and your verdict must still be for defendant, unless you further find and believe from the greater weight of the evidence that said car was unsound and defective, and either known to have been so by defendant, or by the exercise of ordinary care upon its part could have been known; and further that said unsoundness of said car directly caused plaintiff's injuries.

"11.   The burden of proof in this case is upon the plaintiff.    Before the jury can, therefore, find for plaintiff, they must believe and find from the preponderance or greater weight of all the evidence:

"1st, that the Union Line car 7919 next to defendant's tender caused plaintiff's injuries.

"2d, that said car was defective, unsafe and unfit for the purposes for which it was then used.

"3d, that said defects were known to defendant, or by the exercise of ordinary care upon its part could have been ascertained by reasonable inspection upon the part of said defendant.

"Unless the jury find from the greater weight of all the evidence in favor of plaintiff upon all three of the propositions aforesaid, the verdict must be in favor of the defendant.

"12. The jury are instructed that, although you may find and believe from the evidence that the train upon which plaintiff was acting as brakeman was, at the time of the injury, being run at a rapid or dangerous rate of speed, and by reason thereof was ditched or wrecked, and the plaintiff injured thereby, yet, under the evidence in this case, your finding should be for the defendant.

"13. Unless the jury believe from the preponderance of the evidence that the Union Line car 7919 broke before it left the track, then your verdict must be for defendant, notwithstanding you may further believe that some portion of said car was unsound or rotten.

"14. It is the duty of the jury under the law to try this cause as they would a suit between two individuals. The fact that plaintiff is an individual and the defendant a corporation should make no difference with the jurors in arriving at their verdict. In considering and deciding the case, the jury should look solely to the evidence for the facts, and to the instructions of the court for the law of the case, without any reference as to who is plaintiff and who defendant.

"You are further instructed that each and all the instructions herein are in harmony with each other and must be considered and construed together in arriving at your verdict."

Defendant also asked the following instructions, which the court refused:

"15.    Under the pleadings and evidence in this case, it is the duty of the jury to return a verdict for defendant.

"16.    The court further instructs the jury that defendant was guilty of no negligence in transporting said car ·7919, and it was loaded at the time of the accident with the flour mentioned in evidence.

"17.    It is charged in petition that defendant was guilty of negligence in having placed and furnished and allowed to be placed, operated and used in its train, car numbered 7919, with the initials U. L. thereon, which was at the time unfit for service, unsafe, old, worn and out of repair, and the timbers of which were decayed and rotten, and which was by defendant overloaded and improperly loaded; you are instructed that the facts detailed in evidence are insufficient to establish any negligence upon the part of defendant in the foregoing respects, causing plaintiff's injury.

"18.    It is further charged in the petition that said car was improperly overloaded with flour; you are instructed that defendant was guilty of no negligence in transporting said car loaded as it was with the flour aforesaid."

To the giving of those instructions asked by the plaintiff, and the refusing of those refused asked by defendant, the defendant duly excepted.

There was a verdict and judgment for plaintiff for $15,000, motions for a new trial and in arrest by defendant, which were overruled, exceptions preserved, and the cause brought here for review.

I.    It is contended by defendant that the plaintiff has stated himself out of court by averring in his petition that the defendant was guilty of negligence in running the train at a dangerous speed, and testifying himself to that effect. The proposition is, that it appears from plaintiff's pleading

and proof that the wreck was caused by the negligence of plaintiff's fellow servants in running the train.

The petition does charge that the train was being run at a rapid and dangerous rate of speed, and that by means of the defective car and the dangerous rate of speed the accident occurred. If this petition under a strict construction *contra proferentem* is liable to the interpretation that the rapid and dangerous speed of the train was the cause of the accident; it would have been held bad on demurrer, if a demurrer had been in season interposed. But after issue joined and trial and verdict, the court will not construe the petition most strictly against the pleader but the pleading will "be liberally construed, with a view to substantial justice." [R. S. 1889, sec. 2074; Young v. Shickle H. & H. Iron Co., 103 Mo. 324; McDermott v. Claas, 104 Mo. 14; People's Bank v. Scalzo, 127 Mo. 164.]

If a petition founded on negligence states two acts, each constituting negligence, and each sufficient in itself to sustain the cause of action, if there be proof to sustain one and no proof of the other, the action will not fail. And if one of the acts charged as negligence is not, under the law of the case, such negligence as defendant is liable for, the petition is vulnerable to special demurrer or motion to strike out. But a party who wants to insist on his right to have his adversary state his case under the strict rules of pleading must make his demand known to the court in due season, and in due form. If he waits and takes his chances on a verdict he will not be relieved from the effect of an unfavorable result of his venture, if by a liberal construction, as the statute requires, there is sufficient in the petition to support the verdict.

The petition charges defendant with negligence in two particulars, defective car and dangerous speed of train; the one is cause for which defendant is responsible to plaintiff,

the other is not.    No demurrer is interposed, nor motion to strike out, but issue is joined and the cause is tried.  If in that condition of the pleadings the evidence shows that the injury complained of was the result of that act stated in the petition, for which the defendant is not responsible to the plaintiff, the court should then on demurrer to the evidence take the case from the jury.    But if the evidence shows that the injury resulted from the cause for which the defendant is liable to the plaintiff, the court would not allow the plaintiff's just cause to be defeated on account of an uncovered defect in the petition easily susceptible of amendment.    The demurrer in this case was not directed to the petition before trial nor was it leveled at the plaintiff's evidence alone at the trial, but came after all the evidence of defendant was in, and must be considered in that light.

Now what was the evidence to support the demurrer on the ground that the accident was caused by a dangerous speed?    Plaintiff testified that he noticed that the engineer did not shut off as he generally did, and the train was going too fast; he looked to see what condition the drive wheels were in, he had not been on the road long enough to tell the speed of the train by riding.    "I thought we were running too fast, and think about that time we were going in the ditch."    That is all the evidence in the case tending to prove that the train was running at a dangerous speed, and that the opinion of a boy nineteen years old with experience less than a year as brakeman.

Suppose we leave out of view for the moment the fellow servant doctrine and suppose the defendant would have been liable to plaintiff if the accident had been caused by running the train too fast, and suppose that was all the evidence of the fact the plaintiff had to rely on, is there a court in all the land that would have suffered a judgment to go against the defendant on that evidence?    Then if it would not justify a verdict in his favor, would justice allow it to preclude him

from a recovery, that he was otherwise entitled to? Grant-
ing all that may be said about the difference between an ad-
mission of a fact by a party against his interest, and the as-
sertion of the same in his interest, still how much does this
boy's opinion, formed under those circumstances, weigh,
whether you put it in one side of the scales or the other?

But defendant's witnesses completely negative the idea
that the train was running too fast. They say it was run-
ning from twenty to twenty-five miles an hour, the conductor
said they were two hours late, but were not trying to make
up time, that they were not using steam, and it was not nec-
essary; they were in half a mile of the side track, where they
were to wait for the passenger train. Defendant did not try
to show that its road was in bad order so that a train could
not safely run over it at the speed of twenty-five miles an
hour. No witness said that twenty to twenty-five miles an
hour was a dangerous speed and no witness would have been
believed if he had said so.

The idea that the train was running at a dangerous
speed was effectually removed from the consideration of the
jury, even if it had had a lodging there, by two instructions
which were written by counsel for defendant, and given at
their request. The argument is now made by the counsel
that those instructions meant that defendant was not liable
to plaintiff, even though the train was being run at a danger-
ous speed because it was the work of his fellow servants. But
that is not what defendant's second and tenth instructions
say, and that meaning in them is not obvious. The last par-
agraph in defendant's instruction 14 directs the jury to con-
strue the instructions all together and in harmony. If the
second and tenth instructions for defendant were intended
to mean what it is now contended they mean, the twelfth
instruction was useless, because the twelfth instruction is, that
although they may find that the train was running at a dan-

gerous speed still as plaintiff was brakeman on the train defendant was not liable. Counsel who drew those instructions did not intend to mislead the court or jury; there was nothing covert in them; they were plain, straightforward and meant what they said.

But not only did the second and tenth instructions for defendant eliminate that question from the case, but the first instruction for plaintiff, emphasized by the eleventh instruction for defendant, limited the inquiry of the jury to the real matter in controversy, so that it would be impossible for an intelligent juror to make a mistake as to the issue he was to try.

There was nothing in the pleadings or evidence that would have justified the court in taking the case from the jury on the fellow servant doctrine.

II.    But defendant insists that there was no evidence tending to show that it was liable on the theory that the wreck was caused by the alleged defective car.

Under instruction one given for the plaintiff, the jury were directed to find for plaintiff if they were satisfied from the evidence that the car was rotten and for that reason unsafe, that defendant knew, or by the exercise of ordinary care might have known, its condition, that because of such condition it broke and the train was thereby wrecked and plaintiff was injured as the result, without fault on his part.

This was followed by instructions for defendant elaborating and guarding each proposition from defendant's standpoint, and finally analyzing and summarizing the issues in instruction 11, and placing the burden of proof on the plaintiff. Defendant has nothing to complain of in those instructions. The jury found for plaintiff and the court overruled the motion for new trial. In this condition of the record this court is not called upon to weigh the evidence to ascertain on which side is the preponderance. We are to

look at it only to see if there was substantial proof to support the plaintiff's side of the issues.

There was no doubt in the minds of those who were upon the scene at and immediately after the accident, that it was the breaking in two of the front car that caused the wreck. And if they have described that scene to us truthfully, we can have no doubt of it. There was the front car broken in two, the rear end still on the track, its timbers dropped down in front, having plowed against the ties, and all the other cars piled in a wreck against and behind it. And the front end—where was it? Still coupled fast to the tender, off the track, and distant according to some of the witnesses from seventy to eighty feet and according to another from one hundred to two hundred yards ahead. How did the parts get severed in that way? No witness has said and no witness need say. The thing speaks for itself. All the witnesses who undertook to investigate the cause of the wreck examined this car, and some of them examined no further. That was to be expected. If a chain is broken, one looking for the cause naturally examines the broken link, and for the purpose of that inquiry need go no further.

There was one witness and only one who said that the car was whole when it left the track, and the damage to it was caused after. If that was true, then all the other witnesses both for plaintiff and defendant, were mistaken when they said that they found one end of the car on the track and the other end coupled to the tender, some distance ahead. This statement was not made by this witness in his direct examination, nor in his cross-examination, but was his last utterance in his redirect examination, and is in contradiction of his own statements in his chief and cross-examinations, in which he said that the car was broken in two about the center, and the front half remained attached to the tender. The jury doubtless came to the conclusion that it was

improbable that the car had gone off whole, been broken afterwards and the parts got back in the positions they were, by the time the people in the neighborhood collected on the scene.

On the question of whether or not the car was rotten, there were also some facts to speak for themselves. Defendants produced in evidence the plans and specifications under which this car was built in 1887, calling for first-class material and workmanship; it was designed to carry sixty thousand pounds, that was its record capacity; in 1891 its strength had been fortified with what was called Graham Draft rigging, why that was done we are not informed; a few days before this accident the car was sent from the east over defendant's road loaded to one half its record capacity; defendant kept it five days in its yards at Atchison, when it was loaded to one-half its record capacity and put into this train; this was an ordinary freight train of eighteen cars; it was running at not an unreasonable speed, and yet under these not unfavorable conditions the car broke in two. If it was a sound car, capable of sustaining the draft incident to railroad traffic in an ordinary freight train while carrying a load of sixty thousand pounds, why did it go to pieces in this ordinary train while carrying only thirty thousand pounds?

The great noise caused by the wreck attracted many people living in the vicinity, who collected on the scene. Some of them felt interest enough in the matter to examine the broken car, and they testified that its timbers were rotten. We will not now attempt to analyze or review the evidence nor will we weigh it. It was sufficient to carry the case to the jury on that question; it seems to have satisfied them and the trial judge, and there is no occasion for our looking further into it.

Assuming that the car was unfit for service, was its defect such as defendant might by the exercise of ordinary care have discovered it?

Oglesby v. Mo. Pac. R'y Co.

The testimony of the plaintiff's witnesses on that subject was to the effect that the sills of the car were rotten; the witnesses differed somewhat in their forms of expression and to some extent in the degree of decay, but they all gave the idea that the sills were rotten and caused the destruction of the car. The outside sills were painted and the defect in them was not observable to the eye from the outside, but the inside sills were not painted.

It was left to the jury to say whether or not the defects as described by the witnesses were such as might have been discovered by ordinary care.

Defendant undertook to show that the car was inspected in Atchison and in Kansas City by the regular car inspectors. The manner of making these inspections was in evidence; from this it appeared that the inspector in Atchison inspected about one hundred and fifty cars in a day and the Kansas City man inspected about one hundred cars in a night. This car passed through such inspections, and as the inspectors made no note of the car as they would have done if they had seen a defect, they presumed it was in good condition. It was for the jury to say whether or not they were satisfied from that evidence that defendant has used reasonable care to discover the defects. Evidently by their verdict the jury were not satisfied that such inspection came up to the standard of ordinary care.

There was substantial testimony to sustain every fact necessary to be proven by the plaintiff under the instructions given and there was nothing to indicate any fault on his part; therefore there was no foundation for the demurrer to the evidence.

III. The next point pressed on our attention is the contention that the jury awarded excessive damages.

In estimating the damages of plaintiff there is no certain measure to guide us. The law calls for compensation

for the injury, but gives us no table of weights or measures by which the compensation is to be determined. The solution of the question, guarded only by some general limitations, is left to the judgment and conscience of the jury; it must be so from necessity. We say compensation, but compensation is a synonym for satisfaction, and in that sense there can be no full compensation for an injury like that the plaintiff has sustained. But still compensation as nearly as it can be estimated is what the law demands, and it relies, as it must of necessity rely, in a great measure on the sense of right and justice of the jury, subject in some degree to the correcting power of the court. The injuries and suffering of the plaintiff in this case have been of the most distressing character. He was a youth nineteen years old, full of health and strength and spirit; he was thrown under this wreck, and broken and mangled to a shocking degree; his right leg was crushed; first his foot had to be cut off, then his leg was amputated to within seven inches of his hip joint; the flesh was torn from his left leg, from the knee to the ankle, leaving the bone exposed; the details of his suffering are shocking to contemplate and all that remains of him now is a helpless, hopeless cripple.

Counsel for plaintiff in his closing argument before the jury said, "Gentlemen of the jury, it is not for me to say how much, but I think he ought to have a liberal judgment, and in my humble opinion twelve thousand dollars is not too much." It is now contended that that statement put a limit to the amount the jury could assess, and going beyond indicated a spirit of passion or prejudice. We see nothing in that remark upon which to base that contention. It was simply the opinion of the counsel given as such, couched in terms of deference, and disclaiming at the time any controling influence on the subject.

The jury thought that $15,000 was just compensation. There is nothing in the record to indicate that that was any-

thing else than the result of their honest judgment, and there is no reason why we should disturb their verdict.

IV.   What has gone before in discussing the demurrer to the evidence, disposes of the defendant's instructions refused, since they were also in the nature of demurrers to the evidence, and there is therefore no necessity for further discussion of them.

But some of the instructions given for the defendant should not be passed without notice.   Although this is defendant's appeal, and therefore there is no exception to the ruling of the court in giving defendant's instructions, yet as those instructions will be published in this record, and as they contain erroneous views of the law, they are liable to be considered as having passed with the approval of this court and might be followed as precedents.

1.   The first instruction is that although the jury find that the U. L. 7919 car was the first to leave the track, yet that does not prove that the car was unsound.   That is true as a matter of fact, and a plain common sense proposition, but it is not a legal proposition and is not within the province of the court to instruct the jury upon.

3.   The third instruction given for defendant is to the effect that if the jury find that the car was defective, yet the defendant is not liable on that account unless it knew of the defect or by the exercise of ordinary care could have discovered it "by ordinary inspection."   The evidence in this case showed the system of inspection that defendant ordinarily employed, and that was the "ordinary inspection" that the instruction referred to, and the effect of the instruction was that if the car passed through that inspection it was all that the law required.   The vice of the instruction is that it substitutes the defendant's "ordinary inspection" for the law's ordinary care.

4.   Defendant's fourth instruction is that the law presumes that defendant's servants did their duty in inspecting

the car, and the burden is on the plaintiff to show that they failed to do so. There is no such presumption in defendant's favor. On the contrary, when it appears that the servant is injured by a defective appliance furnished by the master the burden is on the master to show that he exercised the ordinary care that the law requires.

V.    The fifth instruction contains the same error.

There is no error in this record of which the defendant has a right to complain.

The judgment of the circuit court ought to be affirmed. GANTT, C. J., and BRACE, J., concur; BURGESS, J., concurs in paragraphs I, II and III.

### SEPARATE OPINION.

MARSHALL, J.—I am of opinion that there was no evidence that the car was not properly inspected, and want of proper inspection was the only act of negligence upon which the plaintiff could predicate a recovery under the facts as disclosed by this record. The defendant showed that it had inspected the car, and the plaintiff offered no evidence that the inspection as made by defendant was not a proper inspection or such an inspection as a man of ordinary prudence would have made under the circumstances. In the absence of such showing I think that the negligence as to inspection was not sufficiently shown, and therefore the judgment should be reversed and the cause remanded.

### SEPARATE OPINION.

### Statement.

SHERWOOD, J.—The petition contains two specific charges of negligence against defendant. The first alleged that defendant negligently took into its train a car that was rotten, defective, unsafe, etc. The second avers that the train in which this was being transported was run at a rapid

and dangerous rate of speed, etc.    Both the foregoing grounds of negligence are charged in petition to have caused the wreck and plaintiff's injuries.

The answer is a general denial.    The instructions, which it will be necessary to notice, hereafter, are the following, to wit:

### *Plaintiff's Instruction Given by the Court.*

1.    The court instructs the jury that if you believe from the evidence in this case that, at the time of the wreck of the defendant's train, the timbers of the car number 7919, Union Line, mentioned in evidence, were rotten and decayed, and that, by reason thereof, the said car was not in a reasonably safe condition for use in defendant's said train; and that defendant knew of, or by the exercise of ordinary care, might have known of the condition of said car; and that by reason of the said condition of said car, if the jury believe from the evidence it was in such condition, the said car broke and the said train was wrecked and plaintiff, while in the line of his employment and without fault on his part, was injured thereby, the jury must find for the plaintiff.

2.    If the jury find for the plaintiff, in estimating his damages, they will take into consideration not only his age and condition in life, the physical injury inflicted and the bodily pain and mental anguish endured, but also any and all such damages, if any, which it appears from the evidence will reasonably result from said injury in the furture, not to exceed in all the sum of $25,000.

Defendants instructions, which were given, are as follows:

I.    Even if the jury should find from the evidence that said Union Line car, 7919, was the first one of the train to leave the track, still this, in and of itself, does not prove that said car was unsafe, unsound or improperly loaded.

II.    It is further charged in petition that said train on which plaintiff was injured was run at a rapid and dangerous

rate of speed; you are instructed that defendant was guilty of no negligence in running said train at the rate of speed disclosed by the evidence.

III.    Even if the jury should find and believe from the evidence that some portion of said car, 7919, Union Line, after the accident, appeared to be unsound or defective, yet the plaintiff is not entitled to recover herein unless the jury believe and find from the preponderance of the evidence, that said defects were known to defendant prior to said accident, or by the exercise of ordinary care upon its part, said defects or unsoundness could have been discovered by ordinary inspection upon the part of said defendant.

IV.    Ordinary care, as used in these instructions, means such care as an ordinarily prudent person would exercise under the circumstances detailed in evidence.

If, therefore, the jury believe from the evidence that defendant through its proper servant or servants, after having received said Union Line car, 7919, for the transportation of flour mentioned in evidence, inspected the same at Atchison, Kansas, then the presumption is that said servant exercised ordinary care in the inspection of said car and did his duty; and it devolves upon plaintiff to show by a preponderance of the evidence that said defendant failed to exercise ordinary care in inspecting said car; and unless the jury shall find from the evidence that said plaintiff has overcome the presumption aforesaid by the greater weight of all the testimony, it should find the issues herein in favor of defendant, notwithstanding said car may have been defective, and by reason thereof caused the injury to plaintiff.

V.    Even if the jury should find from the evidence that said Union Line car, 7919, was the first one on the train to leave the track; that it was unsound; that it caused the wreck and plaintiff's injury, still, unless the jury believe from the greater weight of the evidence that defendant's servants failed to exercise ordinary care in inspecting said

car before the accident, their verdict should be for the defendant.

The jury are further instructed in this connection, that in the absence of any evidence to the contrary, the law presumes that the servants of defendant who inspected said car, performed their duty properly.

VI.   The court instructs the jury that defendant was not required under the law, upon receipt of said Union Line car, 7919, to make tests to discover hidden defects in the construction or in the materials used in the construction of said car.

VII.   If the jury believe from the evidence that there was nothing patent upon the face of said Union Line car, 7919, indicating that it was unsound and unfit for use; and that there was nothing to indicate upon reasonable inspection of same by the servants of defendant that said car was unsound and unfit for the use it was then put in, transporting said flour, then your verdict must be for the defendant, notwithstanding you may also believe that said car was unsound, and that said unsoundness caused the wreck which resulted in plaintiff's injury.

VIII.   The jury are further instructed that the defendant was not bound to furnish to plaintiff absolutely safe appliances and cars with which to work, but was only required to use ordinary care in inspecting this and other foreign cars which came upon its road, so as to ascertain whether any defects or unsoundness appeared thereon which were open to inspection and which could be ascertained by ordinary inspection of same.

IX.   You are further instructed that in considering the charges of negligence alleged against defendant, you are confined solely to said Union Line car, 7919, and can not consider any other supposed negligence which may have caused the injury to plaintiff.

X. The court instructs the jury that defendant was guilty of no negligence in running its train at the rate of speed at which it was run at the time of the accident. If the jury are unable to determine from the evidence whether said Union Line car, 7919, caused plaintiff's injury, or whether it occurred from some other source, then it is your duty to return a verdict for defendant, as the burden of proof herein devolves upon the plaintiff. Even if the jury should find and believe from the evidence that said Union Line car, 7919, was the first car which went off defendant's track, yet this does not prove that said car was unsound or defective, and your verdict must still be for defendant, unless you further find and believe from the greater weight of the evidence  that said  car was unsound and defective, and either known to have been so by defendant, or by the exercise of ordinary care upon its part could have been known; and further that said unsoundness of said car directly caused plaintiff's injuries.

XI. The burden of proof in this cause is upon the plaintiff. Before the jury can therefore find for the plaintiff, it must believe and find from the preponderance or greater weight of all the evidence:

1st. That the Union Line car, 7919, next to defendant's tender caused plaintiff's injuries.

2d. That said car was defective, unsafe and unfit for the purpose for which it was then used.

3d. That said defects were known to defendant, or by the exercise of ordinary care upon its part, could have been ascertained by reasonable inspection upon the part of said defendant.

Unless the jury find from the greater weight of all the evidence in favor of plaintiff upon all three of the propositions aforesaid, the verdict must be in favor of the defendant.

XII. The jury are instructed that, although you may find and believe from the evidence that the train upon which

plaintiff was acting as brakeman was, at the time of the injury, being run at a rapid or dangerous rate of speed, and by reason thereof was ditched or wrecked, and the plaintiff injured thereby, yet, under the the evidence in this case, your finding should be for the defendant.

XIII. Unless the jury believe from the preponderance of the evidence that the Union Line car, 7919, broke before it left the track, then your verdict must be for defendant, notwithstanding you may further believe that some portion of said car was unsound or rotten.

The case was tried in the circuit court of Bates' county, upon change of venue, at the June term, 1894, and a verdict returned for plaintiff, in the sum of $15,000. Motions for new trial and in arrest were filed, overruled, and a bill of exceptions duly filed in said cause. The cause was brought to this court upon a transcript of the evidence, and was originally docketed in Division No. 1, of this court.

The case was certified to the court in banc, without an opinion. The first opinion was written by MACFARLANE, J., in which the writer hereof dissented. The defendant filed a motion for rehearing, which was sustained by the court, the cause reargued, and the last opinion, filed by the same judge, now stands as the opinion of the court, a motion for rehearing having been again filed and fully argued, the cause is for review upon said last motion.

The injury occurred west of Little Blue station, in Jackson county, Missouri, on the eleventh day of December, 1892. The plaintiff was a brakeman upon defendant's freight train, and had been in the service of defendant for about one year, in such capacity. He was on top of the train, when the latter was wrecked. They were going down a grade between Independence and Little Blue, Missouri, when the injury occurred. Some fourteen cars were derailed and practically torn to pieces. The engine and tender likewise were derailed, with the exception of the two small

wheels of the engine. There were no eye-witnesses to the transaction, except the train crew, whose testimony will hereafter be discussed. Practically all the testimony offered by plaintiff was from witnesses who went there to the scene of the accident after the wreck, and with the preconceived idea that the Union Line car mentioned in evidence, was the cause of the wreck, and made their examination accordingly.

Many of the defendant's witnesses examined, not only the U. L. car, but likewise the other cars which were broken, and gave it as their opinion that the other cars were in no better condition before the accident than the U. L. car.

I shall here undertake to refer to the facts in general, without quoting from the record, as the principal contention in the case will arise upon the demurrer to the evidence. It being necessary to quote from the evidence in the opinion hereafter, we shall not undertake to do so in our present statement of the case.

As the petition charges the defendant with negligence in running the train at a rapid and dangerous rate of speed, and in having in its train a rotten and defective car, we shall take up the propositions in the order mentioned.

Plaintiff testified that the train was running too fast, at the time of the accident, and that the engineer did not shut off the steam, nor did the other brakemen set the brakes as they came down this grade immediately before the accident.

The train was about two hours late.

The train was running upon passenger train time, and the crew were endeavoring to make the side track and get out of the way of the passenger train.

The petition likewise charged, that the train was being run at a rapid and dangerous rate of speed and the court, in its instructions given upon the part of defendant, No. 2-10 and 12, *supra*, tried the case upon the theory that the train was run at a rapid and dangerous rate of speed,

although it instructed the jury that defendant was guilty of no negligence in running its train as aforesaid, although the co-servant of plaintiff, may have run it in such manner.

2d.   The next charge is, that defendant was guilty of negligence, in taking into its train a rotten, unsafe and defective car (U. L. car 7919), and that by reason thereof, it, in conjunction with the rapid and dangerous rate of speed aforesaid, caused the wrecking of the train, and plaintiff's injury.

As correctly stated by Judge MACFARLANE, in his opinion, "The car in question was what is known as a Union Line car, and did not belong to defendant.   It was built by the U. S. Rolling Stock Company for the Pennsylvania Company, in December, 1886, was marked U. L. and numbered 7919.   It was built of good materials, according to proper plans and specifications, and was marked as having the capacity of 60,000 lbs."

In the same connection the record further shows that the capacity of this car has never been reduced; and that the average life of said car, was from fifteen to twenty years; that on February 7, 1891—the injury occurring December 11, 1892—said car, 7919, had Graham Draft Rigging placed on it, which greatly increased its strength, and if any rotten sill had been in said car, it is claimed by the superintendent, that it would have been found at that time and changed; that it is not within probability (according to his testimony) that sound timber in such a car, would rot in five and one-half years, or that the timber in this car was rotten at the time of the accident; that no defects in any part had ever been called to the attention of the company.

As stated by MACFARLANE, J.: "On December 7, 1892, the car came into defendant's possession in St. Louis, loaded with 31,800 pounds of nails, and so loaded was hauled over its road to Atchison, Kansas, where it was unloaded, and remained until December 10, 1892, when it was loaded with

30,000 pounds of flour to be carried to St. Louis. The car was inspected at Atchison, and no defects were noted by the registry of the inspector." In the same connection, Elder, witness for plaintiff, testified:

"Q. Do you ever inspect the cars before you load them? A. Not myself; I always tell the teamsters to get good cars.

"Q. Some one under you always notices to see whether or not the cars are defective? A. Yes, sir.

"Q. You never load into defective cars? A. Not if we know it.

"Q. That is your purpose in loading the cars in the manner you described a minute ago? A. Yes, sir."

Judge MACFARLANE in his statement of facts, then continued: "So loaded, the car was carried to Kansas City, when it was again inspected, and no defects were noted."

In this connection Conductor Butts testified:

"Q. You do not know whether this car had been inspected or not? A. Yes, sir.

"Q. Did you see it done? A. Yes, sir.

"Q. Who by? A. The car repairer, that morning.

"Q. When? A. That morning.

"Q. Did you see him doing it? A. Yes, sir. I seen him going around doing it."

Judge MACFARLANE, in regard to his facts, then continued: "On the 11th of December, 1892, the car was put into a St. Louis train. The train consisted of 18 loaded cars, number 7919 being placed next the engine. Plaintiff was a brakeman on this train. While descending a grade east of Independence, about fourteen of the cars were thrown from the track, and plaintiff, who was on top of one of them at the time, was badly injured. The court gave two instructions at the request of plaintiff, and all asked by defendant except those in the nature of demurrers to the evidence."

The car, after having left Kansas City, came back over the same road it had previously traveled, until near Little Blue

station, when the wreck occurred as above stated.   No witness testified that any defects of any kind or description had ever been noticed in the U. L. car, at any time prior to the accident.

The following physical facts appear uncontradicted from the record:   At least one of the rails was found, immediately after the wreck, bent, turned up, or out of place.

Three witnesses, two of whom were introduced by plaintiff, Lehei and Settles, testified as to the condition of the rail aforesaid.

Witness Keller, for defendant, says he noticed one rail out of place.   No other testimony, contradicting the foregoing, that I can find, is in the record.   It likewise appears from the testimony that the tender went off first.

The undisputed testimony of Conductor Butts is to the effect, that a car going off, as the U. L. car did, could not have pulled the engine and tender off the track; as the latter weighs from sixty to seventy tons.

The uncontradicted evidence also shows that the engine and tender were off the track, with the exception of the two small wheels of the engine.

It is likewise uncontradicted that one truck off, will take the engine off with it.

It is likewise testified to by Conductor Butts, that the wreck itself might have damaged the U. L. car, as shown by the testimony.   The evidence without dispute, is to the effect that the other cars which were wrecked, were in no better condition than this U. L. car.   In fact there is no testimony even tending to contradict the foregoing.

The undisputed evidence likewise shows, that the link which fastened the U. L. car to the tender, was twisted half over when found, after the wreck.   (Lafferty's evidence.)

It also stands without contradiction, that the sills were found freshly broken after the wreck.   There were six or eight sills under the car.   These sills were from six to eight inches in diameter.

No other witnesses testified for the plaintiff upon this subject. The cars, when the wreck occurred, went off upon each side of the track.

According to the testimony of Conductor Butts, and the engineer, Donnelly, the engine and tender must have gone in the neighborhood of two hundred yards after leaving the track, and after the wreck occurred.

The track, at the place of the accident, runs north and south.

The engine and tender, with one-third of the U. L. car, went off on the west side of the track.

The hind portion of the car remaining with the wreck, having evidently plowed along in the track or on the ground, must have broken some of the sills, or left them in different shape, from the way they appeared when the wreck first occurred.

At least two or more of plaintiff's witnesses say, that the rear portion was shoved to one side. The other witnesses upon this subject, paid no especial attention to the matter.

The cars were jammed together, and the one next to the U. L. car went off to the west.

The sills were not, as stated by MACFARLANE, J., broken "squarely" off, but nearly so.

Witness Conway speaks of a "square break" or "off break," but this was in reference to the hind portion which had plowed along on the ground.

The testimony of plaintiff's witnesses, tends to show, that after the wreck, after the car was dismantled, from an examination of the freshly broken places, and by looking at the breaks in the sills, these witnesses discovered some defects in the breaks, the size of which are not shown by the testimony. They likewise testify as to only four of the sills being defective.

The undisputed evidence shows that the two outside sills were painted over, and apparently appeared to be sound.

The others testified that the two inside or middle sills, were not painted and seemed to be defective, as they appeared with the car dismantled, and as disclosed by the freshly broken places in plain view, as the car then stood.

All the testimony disclosed the facts in respect to the last matter as just stated.

The testimony by defendant's witnesses, upon this subject, is to the effect that the sills were in sound condition, or practically so.

The only eye-witness who testified to the condition of the U. L. car when it left the track, is brakeman Keller, who says that the car was whole when it left the track, and that the damage was done after it left the track; that he saw the whole car going down, and then undertook to protect himself. Upon these physical facts, with the other testimony, the court gave the instructions heretofore set out, and the jury returned a verdict for $15,000.

The record discloses, that in his closing argument, counsel, for plaintiff, used the following language:

"Gentlemen of the jury: It is not for me to say how much, but I think he ought to have a liberal judgment, and in my humble opinion $12,000 would not be too much."

Notwithstanding this modest suggestion, the jury returned a verdict for $15,000, as shown above, and the defendant now complains in this court:

First. That its demurrer to the evidence should be sustained for the reason that plaintiff failed to make out a case.

Second. Because the plaintiff's first and second instructions are erroneous.

Third. Because the verdict is the result of partiality, passion or prejudice, and that such facts are disclosed by the record, and conceded to be so, in both the original and last opinion on file in this court.

Fourth. Because the case was submitted to the jury upon mere matter of conjecture, without evidence warranting a verdict in favor of the plaintiff.

Fifth.    Because there is no evidence tending to show a failure upon the part of defendant's inspectors to exercise ordinary care in regard to the performance of their duty, concerning the inspection of said car.

Sixth.   Because there is no evidence tending to show that if the defects which were discoverable, had been seen by the inspector or the jury, the inspector or inspectors, were guilty of negligence, in permitting the car to pass, in the absence of any showing that the 60,000 pound car, constructed as this was, could not have carried 30,000 pounds of freight over the same road which it had traveled a few days before, with 31,000 pounds.

Seventh.   It is likewise contended that the verdict is grossly excessive, and that, as the law of remittitur was in force in this State, when the case was tried in the court below, and appealed here, and that the same rule of law should be applied that were in vogue when the case was tried below, and that the case should be tried upon, in the court below.

Eighth.   It is likewise contended, that when this court judicially determines, as it has done, that the verdict is for $3,000 more than ample compensation, it is the duty of the court by virtue of its inherent and constitutional right, to direct a new trial, in order that the ends of justice may be subserved thereby.

I shall endeavor, in the following pages, to take up all, or the principal portion of the foregoing propositions, and, after citing facts fully in support of my opinion, endeavor to demonstrate that the majority opinion here, is unsupported, either by the law, or the facts in the case.

## Opinion.

"Respondent must stand or fall in this court by the theory on which he tried and submitted his case in the court below."   [Walker v. Owen, 79 Mo. 568; Holmes v. Braid-

wood, 82 Mo. 617; Witascheck v. Glass, 46 Mo. App. 214; Martinowsky v. Hannibal, 35 Mo. App. 78, 79; Fell v. Coal Mining Co., 23 Mo. App. 224; Brooks v. Yocum, 42 Mo. App. 521.]

(a) A plaintiff is bound by the allegations of his petition, and although the latter may contain unnecessary averments, yet, as long as the petition stands unamended, he is bound thereby. [Bruce to use v. Sims, 34 Mo. 251; Speck v. Riggin, 40 Mo. 406; Capital Bank v. Armstrong, 62 Mo. 65; Chapman v. Callahan, 66 Mo. 312; Donnan v. Int., etc., Pub. Co., 70 Mo. 175; Kuhn v. Weil, 73 Mo. 215, 216; Weil v. Posten, 77 Mo. 287; Wilson v. Albert, 89 Mo. 546; Bensieck v. Cook, 110 Mo. 182; McManamee v. Railroad, 135 Mo. 447.]

In the case of Bruce to use v. Sims, *supra*, the rule was clearly announced, at an early date, and has since been followed with uniformity, as follows: "The answer of the defendants, averred that Davis was, at the time of the levy, the full and absolute owner of the slave, and they can not be permitted to contradict their own pleading by setting up that the slave belonged to the partnership. Their averment was probably unnecessary, but, having made it, they must abide by it."

(b) The rule of law is equally as well settled in this State, that where a party to a suit testified at the trial, and makes material admissions affecting his own interest, he is bound thereby. [State v. Curtis, 70 Mo. 595; State v. Peak, 85 Mo. 190; Bogie v. Nolan, 96 Mo. 91; State v. Brooks, 99 Mo. 137; State v. Bryant, 102 Mo. 32; State v. Turlington, 102 Mo. 663; Payne v. Railroad, 129 Mo. 405; Ephland v. Railroad, 137 Mo. 187; Robbins v. Butler, 24 Ill. 387.]

The plaintiff testified at the trial, upon this question, as follows: "I looked back, the conductor gave a signal to go ahead, and I looked at my watch, and saw we were close on

the passenger train time; we went down to the first sag going out of Elm Park, probably about for a mile or three-quarters from the hill, and from there down to Little Blue is down grade, around several curves, and when we came over the grade, I noticed the engineer did not shut off as he generally does; I looked back, and saw the middle brakeman about four cars from the caboose, with his hands behind him; he did not seem to make any motion to set brakes, and I did not set my brakes until I got down, but I noticed the train was going too fast; I never looked to see whether anybody else was setting brakes or not; I commenced setting brakes when we turned the curve; I looked out to see what condition the drive wheels were in; I had not been on the road long enough (from six to twelve months) to tell the speed of the train by riding; I thought we were running too fast, and I think about this time, we were going in the ditch.

The plaintiff not only charges in his petition, that defendant was guilty of negligence, in permitting said train to run, "at a rapid and dangerous rate of speed," but likewise testified accordingly, and gave the circumstances under which it was done.

This court is, therefore, legally bound to consider the case as it was presented below, and upon the admitted facts, *supra*, unless it can be gleaned from the record, that the foregoing matter was, at the instance of defendant, withdrawn from the jury, which I will now proceed to consider.

Judge MACFARLANE, in his opinion, disposes of the question, as follows: "Defendant's counsel insists, that under this evidence the accident could as well be attributed to the rapid rate of speed of the train, or to the tender first leaving the track, as to the breaking of the defective car, that the entire evidence is equally consistent with any of the three causes, and what the real cause was, is a matter of mere conjecture.

"It may be stated here, that there was no evidence that the train was run at a negligent rate of speed, and the court so instructed the jury."

If it should turn out, from a careful consideration of the pleadings, evidence and instructions given by the trial court, that the author of the opinion herein concurred in by the other judges, has received an erroneous impression, in respect to the facts aforesaid, and that directly the reverse of the foregoing appears, then defendant's contention is well supported, the judgment should be reversed, for the obvious reason that it is unsustained by any legal evidence, being predicated alone upon conjecture.

The court below, in unmistakable language, sustained defendant's contention, when it gave, at the instance of defendant, and without objection upon the part of the plaintiff, instruction numbered two, as follows: "It is further charged in petition, that said train on which plaintiff was injured, was run at a rapid and dangerous rate of speed; you are instructed that defendant was guilty of no negligence in running said train at the rate of speed disclosed by the evidence. The court instructs the jury, that defendant was guilty of no negligence in running its train at the rate of speed at which it was run at the time of the accident."

But the trial court put the question in controversy, completely at rest in giving, upon the part of defendant, instruction numbered twelve as follows: "The jury are instructed that, although you may find and believe from the evidence that the train upon which plaintiff was acting as brakeman was, at the time of the injury, being run at a rapid or dangerous rate of speed, and by reason thereof was ditched or wrecked, and the plaintiff injured thereby, yet, under the evidence in this case, your finding should be for the defendant."

The plaintiff, as to the conductor, engineer and rest of his train crew, was a fellow servant. [Higgins v. Railroad,

104 Mo. 418, 419; Relyea v. Railroad, 112 Mo. 86; Murray v. R'y Co., 98 Mo. 574; Card v. Eddy, 129 Mo. 517.]

The plaintiff, having charged defendant with negligence in running its train at a rapid and dangerous rate of speed and having sworn at the trial, that the train was run too fast, that the engineer did not shut off the steam nor the brakeman set his brake and it appearing that the train was two hours late, and that they were trying to get out of the way of the passenger train, by making the side track, and it is perfectly manifest that the jury might, and probably would, have found against defendant, and held it liable for the running of the train at a rapid and dangerous rate of speed, had not the court, in the foregoing instructions, in the most explicit language, told them that defendant was not liable on that account, even if the train were run at a dangerous and rapid rate of speed, and thereby caused plaintiff's injuries.

There is not the slightest intimation upon the part of the trial court in giving of said instructions to withdraw from the jury the right of the latter to consider whether the accident was caused by the dangerous rate of speed with which the train was run, and if so found to be the cause—instead of the U. L. car—to return a verdict for defendant.

The defendant still insists—that as against plaintiff, on account of his pleadings and evidence, as well as the instructions aforesaid—this court is compelled to review the case upon the theory that the train was run at a rapid and dangerous rate of speed, and that defendant is not liable therefor. This contention it seems to me, is well founded, and for that reason, I can not concur in that portion of Judge MACFARLANE's opinion, where it is said: "It may be stated here, that there was no evidence that the train was run at a negligent rate of speed, and the court so instructed the jury."

There was evidence to the effect that the train was run at a rapid and dangerous rate of speed. The plaintiff himself swore to it, and stated fully the facts connected therewith.

He charged in his petition that such was the case, and the court below, in instruction two, *supra,* told the jury so. The most casual examination of the record will disclose that the court below did not tell the jury that the train was not run at a rapid and dangerous rate of speed, nor intend to do so. On the contrary, the court simply said that, although the train may have been run at a rapid and dangerous rate of speed, and thereby caused plaintiff's injuries, yet defendant is not liable therefor, for the obvious reason that such negligence was that of plaintiff's co-servants and not the result of the violation of any duty, which defendant owed the plaintiff.

I therefore conclude, for the reason aforesaid, that the opinion, as it now stands, is predicated upon an erroneous idea of the undisputed facts appearing of record, and for that reason, a rehearing should be granted.

## II.

Having attempted to show in the foregoing proposition, that we should consider the case here upon the theory that the train was run at a rapid and dangerous rate of speed, and that defendant should not be held responsible for any damages resulting therefrom, I shall now consider the evidence appearing of record, for the purpose of determining whether the case was submitted to the jury upon mere conjecture, or whether there was substantial evidence introduced at the trial, which can be held sufficient to sustain the verdict, as returned.

(a) The trial court probably gave defendant's instruction numbered 10, which contains the following: "If the jury are unable to determine from the evidence, whether

said Union Line car, No. 7919, caused plaintiff's injury, or whether it occurred from some other source, then, it is your duty to return a verdict for defendant, as the burden of proof herein, devolves upon the plaintiff" . . . and this instruction is abundantly sustained by the following authorities: [Railroad v. Schertle, 2 A. & E. R. R. Cas. 158; s. c., 97 Pa. St. 450; Wintuska's Admr. v. Railroad, 20 S. W. (Ky.) 820; Duncan v. W. U. Tel. Co., 58 N. W. 75; Orth v. Railroad, 50 N. W. (Minn.) 364; O'Malley v. Railroad, 113 Mo. 325; Perkins v. Railroad, 103 Mo. 52; Peck v. Railroad, 31 Mo. App. 125; Glick v. Railroad, 57 Mo. App. 105; Moore v. Railroad, 28 Mo. App. 625 et seq.; Hughes v. Railroad, 16 S. W. 275; Cotton v. Wood, 8 C. B. (N. S.) 568-571 (Cited Thompson Neg. 364); Hayes v. Railroad, 97 N. Y. 259; Baulec v. Railroad, 59 N. Y. 366; Megow v. Railroad, 56 N. W. (Wis.) 1099.]

Leaving out of consideration, for the present, the common law rule, with respect to fellow servants, and assuming that if plaintiff was injured by the negligence of the train crew in running the train at a rapid and dangerous rate of speed, he would be entitled to recover. This can not change the result in ascertaining the real cause of the accident, for, if the rapid and dangerous rate of speed with which the train was run was the direct and proximate cause of plaintiff's injury, it should be considered, in arriving at the real truth, to the same extent as though the plaintiff were entitled to recover upon such showing.

The case then stands in this court with the charges of negligence, separately stated as follows: Plaintiff, in his petition charges that defendant negligently permitted its train of cars, upon which he was brakeman, to be run at a rapid and dangerous rate of speed, and thereby derailed the train, and caused the injuries complained of.

Had a verdict been rendered for plaintiff upon this proposition—leaving out of consideration the rule in regard

to negligence of co-servants—could it be sustained by the record in the cause?

I affirm, without hesitation, that the plaintiff, upon the undisputed facts in respect to the foregoing matter, would have plain sailing in this court.

As heretofore shown, we are bound by the allegations of the petition, to the effect that the train was negligently run at a rapid and dangerous rate of speed, and caused plaintiff's injuries.

2d. The train was two hours late, and running closely on passenger train time. The crew were endeavoring to make a side-track at Little Blue, to get out of the way of the passenger train.

Here, then, was a motive for fast running.

3d. Plaintiff testified: "I looked at my watch, and saw we were close on the passenger train time; we went down to the first sag going out of Elm Park, probably about for a mile or three quarters, from the hill, and from there down to Little Blue, it is down grade, around several curves, and when we came over the grade, I noticed the engineer did not shut off as he generally does; I looked back, and saw the middle brakeman about four cars from the caboose, with his hands behind him; he did not seem to make any motion to set brakes, and I did not set any brakes until I got down, but I noticed the train was going too fast. . . . I thought we were running too fast, and think about that time, we were going in the ditch." We have, in this connection, the plaintiff watching the conductor to see whether they should go ahead; the engineer failed to shut off steam as he usually did; the middle brakeman was standing there with his hands behind him without making any motion to set the brakes.

The plaintiff saw these things with his own eyes, and then says the train was running too fast.

4th. Engineer Donnelly, testified: "Q. Did you know where the engine stopped? A. Yes, sir. Q. State

to the jury, starting with that as a point, how far it was to where the first car went off the track, and struck the tie? A. I could not state correctly; I should judge 250 or 300 yards. Q. From where you stopped the engine to where the cars went off? A. Yes, sir."

Conductor Butts testified: "Q. How much of a grade is it? A. Well, it is a pretty good grade; it takes a 70 ton engine to pull 16 or 17 cars up; 18 is a heavy load." The same witness likewise swore that a car jumping the track, could not have carried with it, the engine. He likewise gives it as his opinion that the U. L. car might have been crushed by the wreck itself.

Witness Scow testified, that he thought it was six hundred or eight hundred feet from where the engine stood, to where the first car went off.

The foregoing, with much other testimony, tended to show that the train was traveling at a very rapid rate of speed.

5th. Engineer Donnelly must have had in mind the rapidity with which the engine and the train were run, without shutting off steam, or setting the brakes, when he testified as follows: "Q. You did not make any examination of the car next the engine, and the others to see what caused the wreck? A. No, sir: I did not know but that there would be some censure attached to me. Q. What did you suppose they would censure you about? A. I did not know; when you are working for a railroad company, there is a great many things spring up; every man is supposed to look out for himself."

6th. The undisputed evidence of the following witnesses shows that every wheel of the engine and tender were off the track, except the two small wheels of the engine —Patrick, Ashcraft, Conway, Settle, Lafferty, Scow, Donnelly, Welsh, Downey.

Judge MACFARLANE, in his opinion, says: "Two wheels of the engine were off the track," when the uncontradicted evidence *supra* shows that they were all off, except the two small wheels of the engine.

7th. It is correctly conceded in the opinion, that when the U. L. car broke, one-third of same remained attached to the engine, and the link fastening same was twisted.

8th. Witness Hesler says: The first car which he observed going down, was the U. L. car. This of course, would be true, if the tender went off first.

9th. Fireman Rast testified as follows: "Q. What was the first thing you observed on that occasion? A. Well, the first thing that I observed was, that the tender was off the track, and I started to get off, everything stopped, and I saw the cars piled up behind us."

10th. The foregoing testimony is corroborated by that of Engineer Downey, who testified: "A. This crash happened before the engine left the track; my attention was called, the fireman hallooed, 'We're off the track.' I jumped off my seat, preparatory to reverse the engine; I did not hardly get the engine reversed, before she stopped; she had four pair of drive wheels off." This witness further testified: "Q. You do not tell the jury that the engine ran 200 yards off the track, after it left the track? A. No, not all off, but part off, and part off will help the engine getting off; just one truck off will be the means of throwing the rest of the engine off."

11th. But the testimony of witness Keller—who was on top of the train, where he could and did view the wreck, is uncontradicted by a single witness. His evidence is as follows: "Q. Do you know whether the damage which was done to the car, was caused by its leaving the track, or whether it was broken before it left the track? A. The damage was caused after it left the track; the car was whole when it left the track."

This testimony stands undisputed by a single witness or circumstance, and completely demonstrates to my mind that he and the fireman are both correct, and that when the tender went off it carried with it the U. L. car.

12th. The U. L. car was built of first-class material. It was built new in 1886. It was greatly strengthened by the Graham Draft Rigging on February 7, 1891, when the accident occurred December 11, 1892. Superintendent Potter testifies, that in his opinion the car was sound in December, 1892. Its average life was fifteen to twenty years. Its capacity was 60,000 pounds. It was presumably inspected, and received by defendant, containing 31,800 pounds of nails, about one week before the accident at St. Louis, and hauled over same road where accident occurred, to Atchison, Kansas.

It remained there a few days, and Elder, the owner of the flour, directed his teamster to get good cars, and presumably, at least, the U. L. car was selected by the teamster as a sound one.

Defendant's inspector at Atchison inspected the car, and as the jury were instructed, presumably did his duty. It was put in defendant's train, and carried to Kansas City, where it likewise was inspected, and presumably in a proper manner, as instructed by the court.

Conductor Butts saw the car inspected at Kansas City the morning of the accident. No defects of any kind or description, were observed in regard to said car before the wreck. The inspector at Kansas City testified that they usually spend as much as twenty-five minutes inspecting foreign cars (like this).

The train, then containing this apparently sound car, started from Kansas City on said morning of the eleventh of December, 1892, and had traveled over the worst portion of the same road, when the accident occurred.

It only had 30,000 pound of flour at the time, while its carrying capacity was 60,000 pounds. It had just gone over the same road a few days before, with 31,800 pound of nails, in apparently the same condition.

13th. The undisputed evidence shows, that none of the other cars which left the track were any beter than the U. L. car. Wilson, Dunnigan, Scow and Welsh were the only witnesses who testified upon the subject, and they all say the U. L. car was as sound as either of the others.

14th. The uncontradicted testimony of Lehei, Keller and Settle, shows that at least one of the rails was bent, broken or out of place.

15th. None of the witnesses put the rate of speed at which this heavily loaded train was run down the grade around the curves, at less than twenty miles per hour. No witness testified that a train, on such a grade, over and around such curves, and running with eighteen heavily loaded cars (as this one was) could have traveled in safety at even twenty miles per hour.

With all the foregoing testimony, taken in connection with the physical facts, could any court in Christendom say, aside from plaintiff's allegations in the petition that the train was run at a rapid and dangerous rate of speed, that plaintiff had not made out a clear case, tending to show that the train was run at a rapid rate of speed, and by reason thereof, jumped the track, and caused plaintiff's injury?

Aside from the positive testimony of plaintiff that the train was running "too fast" that "he noticed the engineer did not shut off" as he usually did; that he looked back and saw the middle brakeman with his hands behind him, and making no effort to set brakes, we have the undisputed evidence that the train was about two hours late, and in the way of the passenger train; that the crew were attempting to make a side-track at Little Blue to get out of the way of the passenger train. This disclosed the motive for running fast. The

statement of the engineer, that "I did not know but that there would be some censure to me," indicates that he knew he had been traveling too rapidly. His evidence, heretofore set out, in which he says his engine ran two hundred to three hundred yards after the first car left the track is a clear admission that he must have been traveling at a rapid and dangerous rate of speed.

How, then, did the engine and tender get off the track unless from the rapid rate of speed, with the heavy load around those curves and down such a grade? Only about one-third of the shell of the U. L. car without any of its load remained attached to, and went with the engine and tender. The conductor swears the U. L. car could not have gone off and carried the engine and tender with it.

The fireman says that the first thing he observed was, that the tender was off. He then hallooed to the engineer, "We're off the track."

The positive testimony of the eye-witness, Keller, is to the effect that the U. L. car was whole when it left the track, and that the damage was done after it left the track. With the foregoing array of physical facts and testimony upon the subject, does it not conclusively appear, that the train was wrecked alone by the rapid and dangerous rate of speed at which it was run?

If this is not conclusively true, upon what theory can you account for the engine and tender being off the track? If the wreck occurred as claimed by plaintiff, then there was nothing but the one-third of the shell portion of the U. L. car attached to the engine and tender. How, then, could the latter get off?

I apprehend that any careful searcher after the truth, can not escape the foregoing conclusion. When the physical facts, as in this case, stand out in bold relief, undisputed, we have no right to disregard the same, and in lieu thereof, sustain a verdict at war with such physical facts.

[Kelsay v. Railroad, 129 Mo. 362; Hayden v. Railroad, 124 Mo. 566; Lane v. Railroad, 132 Mo. 4; Huggart v. Railroad, 134 Mo. 680; Nugent v. Milling Co., 131 Mo. loc. cit. 258; Payne v. Railroad, 129 Mo. 405.]

The record, therefore, showing as it does upon its face, affirmatively that the injury complained of is the result of the negligent and rapid rate of speed with which the train was run, and was occasioned in no other way, the plaintiff, upon whom the burden of proof rests, has completely failed to make out a *prima facie* case. A rehearing should be granted, and in my opinion, the judgment reversed and the judgment entered here for defendant.

### III.

The second charge of negligence, alleged in the petition, is in respect to a failure upon the part of defendant, to properly inspect the U. L. car, and in taking the same into its train, when it was rotten, defective and unfit for use.

As heretofore shown, this charge is somewhat blended with the one charging that the train was run at a rapid and dangerous rate of speed. It is alleged that both produced the injury complained of.

I have endeavored to show by the preceding portions of this opinion that the real cause of the injury was the rapid and dangerous rate of speed with which the train was run.

I shall now take up the remaining proposition for the purpose of determining whether there is any evidence upon which the jury could find that defendant was guilty of negligence in failing to inspect the car. In this connection, however, it is proper to observe that the court below, without objection upon the part of plaintiff, gave, at the instance of defendant, instruction numbered 13, which reads as follows: "Unless the jury believe from the preponderance of the evidence that the Union Line car number 7919 broke before it left the track, then your verdict must be for the defendant,

notwithstanding you may further believe that some portion of said car was unsound or rotten."

The court likewise, among other things, in instruction number 10, given without objection, upon the part of defendant, correctly stated the law as follows: "Even if the jury should find and believe from the evidence that said Union Line car number 7919 was the first car which went off defendant's track, yet this does not prove that said car was unsound or defective." . . .

It will thus be seen that the issues as to the present charge of negligence are as against this plaintiff confined to a narrow limit.

It is unnecessary to again repeat the testimony set out in the last proposition, as to the condition of the U. L. car before the wreck. Suffice it to say, that it was built in 1886; that its average life was fifteen or twenty years; that it was made of first-class materials; that it was properly inspected before it was received; that its carrying capacity was sixty thousand pounds; that in February, 1891, the injury having occurred in December, 1892, this car was greatly strengthened by the Graham Draft Rigging, which was placed upon it. The superintendent, an expert railroad man, gives it as his opinion that it is not within probability, with such sound timber in a car of this description, that it would rot in five and one-half years, and also states that in his opinion the timber was not rotten at the time of the accident.

Said car was loaded with thirty-one thousand eight hundred pounds of nails, presumably inspected by the person who loaded it; the defendant railway company which received it for transportation at St. Louis, presumably inspected it before it came over the road where the wreck occurred. The teamster of Mr. Elder, who was shipping the flour, presumably inspected the car and selected it because it appeared to be sound.

Defendant's inspector at Atchison likewise inspected said car; it was likewise inspected at Kansas City before it went into the train, and found to be in good condition; and Conductor Butts saw the car inspected.

It is conceded that no one ever saw any defect of any kind or description in this car prior to the accident. All the testimony of defendant goes to show the car was sound. It only had thirty thousand pounds of flour at the time of the accident, and had traveled over the same road which it had gone over less than a week before, with thirty-one thousand eight hundred pounds of nails.

It likewise had traveled back from Atchison over the worst portion of the road and down those grades and around the curves, between Independence and Little Blue, before the train was wrecked.

Immediately after the accident, as heretofore shown, one of the rails was found to be broken. The first thing which any of the train men observed in regard to the wreck was that the first fireman noticed the tender off the track.

The engineer testified that the fireman hallooed to him, "We're off the track." The conductor swears that the U. L. car could not have carried the engine and tender off the track.

The engineer swears that with one truck off it will carry with it the balance of the engine and tender.

The indisputable evidence shows that none of the other cars were in any better condition than the U. L. car. No witness puts the speed of the train at less than twenty miles per hour, and if the U. L. car had broken down as claimed by plaintiff, it could not have possibly dropped where it was found by the witnesses after the wreck.

This was a physical impossibility, as the speed aforesaid would have carried it quite a distance and necessarily have left the sills and other timber of the car dragging along in a dilapidated condition. The undisputed evidence likewise

discloses that one-third of the shell of the car remained attached to the engine and tender and were all found on the west side of the track. The sills were six or eight inches in diameter and from six to eight in number. They appeared to be freshly broken after the wreck.

Witness Hessler says that the first car which he saw go down was the U. L. car. This was perfectly consistent with the testimony of the fireman and defendant's evidence upon the obvious theory that if the engine and tender went off first this car, which was next to them, necessarily had to leave the track before either of the others.

In this connection, however, the positive testimony of Keller, who was on top of the train, and saw the whole performance, is to the effect that said U. L. car was whole when it left the track and the damage was done to it after it left the track.

With this undisputed testimony and the conceded physical facts what does the plaintiff offer in this court in the shape of testimony to overcome the overwhelming array of facts against this contention?

No one pretends to have seen the U. L. car break down before it left the track. No one saw any portion of it break. On the other hand, Keller swears positively that it was whole when it left the track, and that the damage was done to it afterwards. This is fully corroborated by the history of the car, by the inspections theretofore made, and by the fact that it had just gone over the same track a few days before with a larger load, when its carrying capacity was sixty thousand pounds and it only had on thirty thousand pounds at the time of the accident.

But in majority of opinion it is suggested as the rear portion of this car was found on the track, therefore, it must have dropped down. It strikes me as being unreasonable to say that the testimony of any witness discloses when and where the rear portion of this U. L. car first struck the

track.   Witnesses Conway and Lafferty, for plaintiff, both testified that the forward end of the rear portion of the car was across the track and not lying on the track.

But conceding that plaintiff had some testimony to the effect that the rear portion was found on the track other cars were likewise found in the same condition, for it is manifest that the plaintiff himself was taken out from under a portion of one of the other cars close to the track.   As heretofore suggested, however, if the train was only traveling twenty miles per hour and this car broke in two and two-thirds with the load fell upon the track, can any one in the face of these physical facts say that it stopped suddenly and occupied the same position when found after the wreck that it did when the wreck first occurred?   No one pretends to swear that such a state of facts did exist.   As this court of late holds that the physical facts will overcome oral testimony to the contrary how much stronger should the rule obtain in the present case?   Here there was no oral testimony in support of plaintiff's theory, while Keller (an eyewitness to the transaction) swears directly the opposite.

The physical facts support Keller to the extent at least of saying that where the witnesses, after the wreck, found this car was no evidence of where and how it fell nor of the condition of the sills at the time they broke.   Even if the sills of the rear portion had been broken squarely off, they would not necessarily have appeared in that condition after the wreck, when this portion of the car, had confessedly, from the very necessity of the case, plowed along on the ground some distance, on account of the momentum of the train.

It, therefore, seems plain that on this proposition the plaintiff's theory, as well as that of this court, is too untenable for serious consideration.   But while the jury have a right to draw inferences from the facts proven, yet where the facts are conceded and known, this court has the right and it is its duty to apply the law thereto and govern itself

accordingly.   Assuming, therefore, that the rear portion of
the U. L. car was found on the track, with its sills
broken squarely off, does this prove or tend to prove that it
broke before it left the track?   If so, the argument would
apply to each of the other cars, for there is no evidence
tending to show that they were in different conditions.

The undisputed evidence shows that the cars went off
on both sides and would it not be mere conjecture for the
jury to say that upon the testimony of witnesses who viewed
the track after it had occurred that because they described
a portion of the car found on or near the track at a place
where it finally stopped, therefore, the car must have broken
down, in the face of the physical facts aforesaid and the posi-
tive testimony of Keller?   What conjecture would be drawn
from any evidence which authorized this conclusion?   In
other words, suppose it to be conceded in this court that this
portion of the car was found with its sills squarely off, after
the wreck, and nothing said about the other cars, nor about
the force which was used in breaking this, and the other cars?
Would it not be mere conjecture to assume that this car
broke down, because of its defective condition on the track,
and caused the injury?   In other words, this would simply
be assuming the very fact in issue, and assuming that which
was shown not to be true, by the positive testimony of
Keller.

Again it is likewise contended that after the wreck de-
fects were shown in the sills of this car, and that, therefore,
the jury had the right to draw the inference that the car
broke down before it left the track on account of such de-
fects.   Assuming that such an inference could properly be
drawn, yet, can a single defect disclosed by any witness be
pointed out, designating its dimensions and size and the effect
it would have upon the sills of the car?   On the other hand,
if these defects were such as to render the car unfit for use,
why did they not give way when the same car, with a larger

Oglesby v. Mo. Pac. R'y Co.

load, had gone over the same track a few days before? Again, why did they not give way when the same car had come back from Atchison, down these grades and around the curbs, between Independence and Little Blue, before the accident occurred?

This it strikes me is sufficient answer to the inference attempted to be drawn to support the verdict. But to overcome it entirely we only have to refer to the positive and undenied testimony of the witness Keller who saw the car go off and says it was whole when it left the track.

To this same proposition, let us apply also the testimony of the fireman that the tender went off first, and as said by the engineer, this would necessarily carry the others with it.

Again, to overcome this same inference, I have shown that the most reasonable hypothesis is that the rate of speed caused the wrecking of the train, otherwise the engine and tender could not and would not have left the track. This is the testimony upon which this court has placed itself upon record, as saying, authorized the jury to infer, in the face of the overwhelming and undisputed testimony and physical facts to the contrary, that the car broke before leaving the track.

As the burden of proof devolved upon plaintiff and as he was required to show that this car broke down before it left the track, and that it was unsafe and unfit for use, I can not yield assent to opinion which sanctions a verdict of the character returned for. In my opinion, it does not attain the dignity of respectable conjecture.

In concluding this proposition, after a careful perusal of the testimony, as well as the briefs of counsel, we assert that, leaving out the whole of defendant's testimony upon this branch of the case, the plaintiff has signally failed to produce any substantial testimony and the jury has simply returned a verdict predicated purely upon conjecture. With the physical facts, with the history of the car, and with the

positive testimony contradicting plaintiff's theory, in respect to the foregoing matter, I am at a loss to understand how any judicial mind can sustain the verdict found upon the facts disclosed by this record.

I therefore, conclude not only that the wreck was caused by the rapid and dangerous rate of speed with which the train was run, as shown in the preceding proposition, but likewise concluded that the overwhelming and uncontradicted testimony shows that the U. L. car did not break down before it left the track, nor produced the injury complained of.

(1)    From these facts and circumstances detailed in the preceding proposition I insist that the record shows beyond any reasonable doubt that the wreck occurred in consequence of the rapid and dangerous rate of speed with which the train was run at the time and place and under the conditions mentioned in the evidence.

(2)    And if the engine and tender could have broken the rail as it went over, and thereby have caused the tender to jump the track as testified to by the fireman, and that, as the U. L. car was next to it, it necessarily would have been the first car to have left the track as testified to by witness Hessler.

(3)    If you leave out of consideration the fact that the U. L. car left the track first, whether broken or otherwise, the plaintiff could, in this court, have taken up either of the other cars, which were in no better condition than the U. L. car, and have presented the same case, as against defendant, predicated upon conjecture, as he now presents in reference to said U. L. car.

As, under the instructions aforesaid, he was required to prove not only that it left the track first but broke before it left the track, he could just as well attribute the accident to either of the other cars, under the admitted facts in this case, as the U. L. car aforesaid.

If this case, upon inspection and examination of the facts, does not disclose one predicated purely upon conjecture, I am at a loss to know when the facts bring it within the range of surmise and the domain of assumption.

## IV.

This brings me to one of the most important propositions in the case, to wit, whether the car was shown to be unsound and unfit for use and if so, whether the defects attempted to be pointed out, were of such character as that the jury had the right to draw the inference that the inspectors had failed to perform their duty in regard to this car, as to which see:   3 Elliott on Railroads, sec. 1308, and cases cited; McPadden v. Railroad, 44 N. Y. loc. cit. 480, 481; Shearman and Redfield on Neg. (3 Ed.), sec. 87; Wood's Law Mast. and Serv. (2 Ed.), sec. 419; Pierce on Railroads, p. 383; 2 Rorer on Railroads, pp. 1200, 1201; Neg. Imp. Duties (Personal) Ray, p. 133 and following; Krampe v. Brewing Ass'n, 59 Mo. App. 283; Moss v. Railroad, 49 Mo. 170; Murphy v. Railroad, 71 Mo. 202; Roblin v. Railroad, 119 Mo. 484; Sack v. Dolese, 27 N. E. (Ill.) 64; Railroad v. Bates, 45 N. E. (Ind.) 110, 111.

In 3 Elliott on Railroads, section 1308, it is said:   "The mere fact that after the occurrence of an accident defects are discovered in the machinery or appliances is not sufficient to fasten a liability upon the employer. . . . Where reasonable care is exercised in buying machinery and appliances and inspections are made by competent inspectors in a reasonably careful and skillful manner there is no liability, although defects may in fact exist, unless there is after knowledge, a failure to repair."

A large number of authorities are cited by the learned author in support of this proposition.

In McPadden v. Railroad, 44 N. Y. loc. cit. 480, 481, it is said:   "There is no presumption that the rail was

broken before this train reached it. It is unquestioned that the accident was caused by the broken rail, and if the plaintiff claimed that defendant was liable, because the rail was broken before the train upon which he was riding reached it, it was incumbent upon him to prove it. This he failed to do; and if the jury upon the evidence had found it, it would have been the duty of the court to set the verdict aside as against evidence." In this case plaintiff was a passenger and yet the court held that it devolved upon him to prove affirmatively that the rail broke when the preceding train went over the track, and not the one which went over it at the time of the wreck.

In the case of Sack v. Dolese, 27 N. E., *supra*, it is said: "In order to charge the employer when such an accident happens, it must be shown that the defect is one which could be discovered by a proper inspection, even though from the nature of the accident it may be readily concluded that some defect did in fact exist."

Shearman and Redfield on Negligence (3 Ed.), section 87, announces that: "A railroad company is, therefore, not *prima facie* liable to any of its servants for defects in its rolling stock, rails, or bridges, even where such servant is not employed upon the particular thing which is defective, but upon work wholly unconnected therewith."

In Wood's Law of Master and Servant (2 Ed.), section 419, it is laid down: "Therefore, the mere fact that a fellow servant is incompetent, that materials have proved defective, or that the appliances or machinery used in the prosecution of the business have proved insufficient, does not tend even *prima facie* to establish negligence on his part, but the burden in all such cases is upon the servant seeking a recovery to establish the fact that the injury resulted to him because the master did not exercise reasonable and proper care in these respects, or either of them, and this must be established as a fact in the case, and can not result as an

inference from the circumstances that the servant causing the injury was in fact incompetent, or that the materials or resources of the business were in fact defective."

This is one of the clearest expositions of the law upon this subject cited in any of the books.

In Pierce on Railroads, 383, it is declared: "The company's negligence is not to be inferred from the fact of injury by a collision or explosion in case of injuries to passengers or third persons."

In 2 Rorer on Railroads, pages 1200, 1201, it is said: "The onus of proof is not shifted onto defendant by the fact that an injury has occurred from the alleged defect, or we may add, from proof of the injury, and of the defect as the cause thereof. The defect must have resulted from the carelessness of the defendant in selecting or using, or in continuing to use, the objectionable article, with knowledge thereof or such means of knowledge as will charge the party with negligence."

In DeGraff v. Railroad, 76 N. Y. 129, I find it stated: "Upon the next proposition that the exercise of ordinary care would have discovered the defect and that the defendant neglected to exercise such care, a careful examination has failed to satisfy me that the evidence was sufficient to warrant a verdict. In the first place, assuming a defect, there is no evidence what it was or the nature of it. The car was in a train going west, and it does not appear that any one ever saw the chain afterwards, except the person who took the plaintiff's place after the accident, and he only looked at it with a lantern at a station, and saw that it was broken. There is some evidence, although slight, that the car did not belong to the defendant. There was an entire absence of evidence as to the nature and character of the defect, or the cause of the breaking. We may imagine several causes, first, from an original defect in the iron, or, second, in its manufacture, or, third, by reason of weakness and ordinary

decay by use, or, fourth, by getting misplaced on the trip on which the accident occurred. There is no evidence that ordinary care and observation would have discovered all, and either of these defects if they had existed, and they must have so found, as they could not have singled out a defect which ordinary care would have discovered, because the particular defect was entirely unknown. In the next place there was a failure of evidence to show that the defendant, its servants, or agents, did not exercise reasonable care, or make suitable and proper examination.

"It appears that the train was made up at West Albany, that the defendant employs six men in the day time and six at night to inspect freight cars, and there was no evidence what examination was made by those persons of this car, or its brake-chain, before it started on the trip. The only evidence bearing upon the question at all was that of the train despatcher at West Albany, called by the plaintiff, who stated in effect that the inspectors were in the habit of examining the chains to see if they were in their place, and apparently sound, but did not test their strength."

Upon page 131 of same volume, it is further said by the chief justice.

"I have been unable to find any evidence that this chain was not perfect when it was put on, nor that proper care was not exercised in examination by the servants of the company, nor what was the cause of its failure, or whether such cause could have been discovered by the usual and ordinary means. It is argued that the jury might have found negligence, from the fact that there was some defect, but negligence is not to be presumed, and it is apparent that the chain might have become weak from use without being discovered from any ordinary examination, and it is not improbable that this was the condition of the chain, from the fact that on three occasions on this trip, before the accident, it had been

used, and proved efficient in controlling the train. It broke when used the fourth time from a cause unknown; and I think that the evidence is not sufficient to charge the defendant with a knowledge of such weakness, or any negligence or omission to examine."

In Negligence of Imposed Duties (Personal) by Ray, pages 133 and following, it is said: "The proper inquiry is not whether the accident might have been avoided if the one charged with negligence had anticipated its occurrence, but whether, taking the circumstances as they then existed, he was negligent in failing to anticipate and provide against the occurrence. The duty imposed does not require the use of every possible precaution to avoid injury to individuals, nor of any particular means which it may appear, after the accident, would have avoided it. The requirement is only to use such reasonable precautions to prevent accidents as would have been adopted by prudent persons prior to the accident.

"In an action for an injury, occasioned by the alleged negligence of the defendant, the negligence, if any, of either plaintiff or defendant, is to be measured by the condition of things at the place where the accident took place as they were known to exist by each of the parties at the time the acts of each are complained of as being negligent and these acts can not be characterized, one way or the other, by the subsequent determination of conditions unknown at the time to both, or to either, except so far as that knowledge may properly affect the act of the one so informed."

It strikes me, that the foregoing states the law of this case with peculiar aptness. There is absolutely not a scintilla of evidence tending to show that the inspectors did not perform their whole duty in a perfectly proper manner as all other competent men through the country do. The mere fact, therefore, that an accident occurred, and that some of the defects were found by plaintiff's witnesses after the car

was wrecked and dismantled, does not *prima facie* establish any negligence upon the part of defendant's inspectors.

In Krampe v. Brewing Ass'n, 59 Mo. App. loc. cit. 283, Judge ROMBAUER, with his characteristic clearness, announces the law under consideration as follows: "The trial court evidently misconceived the law governing cases of this character. It was for the plaintiff to prove his whole case, and unless he did so, the defendant was under no obligation to show that the plaintiff had no case. It was for the plaintiff to show that the defendant failed to exercise that reasonable care which the law imposes upon the master, and, until he had done this either by his own evidence or that of the defendant, the defendant was under no obligation to explain the causes of the accident on a theory consistent with due care on its own part. Giving to the defendant's evidence its greatest probative force in favor of plaintiff's claim, it still falls short of tending to show the probable cause of the accident, and fails entirely to show that the probability was one which the master in the exercise of reasonable care was bound to foresee and guard against. It results from the foregoing that the trial court erred in refusing the instructions to find a verdict for the defendant."

In Moss v. Railroad, 49 Mo. loc. cit. 170, Judge BLISS declares the law upon a similar question as follows: "The pleader evades the real question, and tenders an immaterial issue. It is the duty of defendant's officers to employ proper servants, but the duty is not an absolute one. If they make careful inquiry into the habits and competency of the men employed, and upon such inquiry believe and have reason to believe them sober, competent and careful, they can do no more, they have honestly and faithfully endeavored to do their duty and there is no contract for anything more. Hence the pleader should have charged a want of care and diligence in the selection of defendant's servants, and not a failure

merely to select those who were competent, for such failure may be consistent with proper care."

It will thus be seen in this case, that the facts under consideration were similar to those at bar. The petition charged that the defendant failed to employ skillful servants, but failed to allege a want of care or diligence in the selection of the servants. It was held that the petition, upon demurrer, was bad. That is exactly this case.

The mere fact that the servant was afterwards found to be incompetent, did not show that defendant was guilty of negligence in employing him, so in the case at bar, the fact that the defects pointed out by plaintiff's witnesses were shown to exist after the wreck, did not in any manner show that the servants of defendant, who were presumed to have done their duty, had failed to do so. . In other words, the inspector may have done everything that ordinary care required, and still might not have discovered the defects complained of.

In Murphy v. Railroad, 71 Mo. 202, upon a similar question, was ruled: "The mere fact of the incompetency of a servant for the work upon which he was employed is not enough to warrant a jury in finding the master guilty of negligence in employing him." [Shearman & Redfield on Negligence (3 Ed.), sec. 91; Moss v. Railroad, 49 Mo. 169; Elliott v. Railroad, 67 Mo. 272.]

In Roblin v. Railroad, 119 Mo. loc. cit. 484, the court declares the law upon the question under consideration, as follows: "But, aside from Tracy's testimony, whenever the law imposes a duty on another, it presumes that such duty was properly performed. 'Therefore, the mere fact that a fellow servant is incompetent . . . does not tend even *prima facie* to establish negligence on the part of the master in employing him, but the burden in all such cases is upon the servant seeking a recovery to establish the fact that the injury resulted to him because the master did not exercise

reasonable and proper care in these respects, or either of them and this must be established as a fact in the case, and can not result as an inference from the circumstances that the servant was in fact incompetent.' [Wood's Master and Servant (2 Ed.), sec. 419.]"

In Ballou v. Railroad, 5 A. & E. R. R. Cases, top of page 486, Judge CASSODAY, in behalf of the Supreme Court of Wisconsin, said: "There should be at least some testimony tending to show that the tests applied to determine the sufficiency of the brake-rod were inadequate, and not in accordance with the most approved methods, to justify the finding of the jury."

With the foregoing propositions of law announcing the rule so clearly, let us examine and see whether the facts in this case form an exception to the rule. Judge MACFARLANE, in his opinion (Propositions 12 to 20 inclusive) undertakes to set up the testimony of the witnesses in respect to the question of inspection as follows: Chas. Patrick, Ashcraft, Conway, Lehei, Settles, Lafferty and John Downey. I shall not undertake to quote fully from the testimony of each, but will simply supplement the testimony already quoted from them, by Judge MACFARLANE, by adding thereto, that which he failed to state, what in my opinion, completely modifies and puts a different light altogether on the testimony of such witnesses when considered as a whole.

Charles Patrick, in extravagant language, quoted in the opinion, would have the court understand that the sills of the car were rotten, worm-eaten and doty, and that the sills broke squarely in two.

It will be found upon an examination of the testimony of these witnesses, that he only described four sills, and then testifies as follows: "Q. What else did you notice then; these sills as you describe as being unsound? A. Yes, sir; and I do not know that the balance of the car was unsound.

Q. These two little sills run right along the bottom of the car? A. Yes, sir."

This witness also described the two outside sills, and the two middle ones. In reference to the outside sills, he said: "Q. Describe whether that portion looked sound, and simply the outside looked worm-eaten? A. No, sir. The outside of those sills that had been painted, would look sound. The same witness testified further in reference to said outside sills: A. Well, I know they were painted." The same witness testified as follows: "Q. Did the break look fresh where they were broken? A. Yes, sir."

Said witness further testified: "Q. How could you examine this car from where you were, if the floor was above? A. Very easily; they lay in a position for me to see everything. Q. Tell the jury, explain that? A. The car was broken in two, right in the center, and the sills of the car, dropped right on the track, and the front end right on down, and was tilted to one side, exposing them plain to my view as those gentlemen sitting there, the end of those sills. Q. You saw the ends? A. Yes, sir." The same witness further testified: "Q. You say only two of them were not painted? A. Two in the center were not painted at all . . . "Q. They were the two middle ones? A. Yes, sir. . . . Q. Wasn't there a fresh break on these two? A. Yes, sir. Q. The part that looked fresh, how was that? A. It all looked fresh, and all was a fresh break. . . . Q. That was painted so that the break could not be seen? A. Anyone could have seen that, if they had looked at it, if their attention had been drawn to it. Q. In the position you occupied? A. Yes, sir. Q. They could have seen it standing where you were? A. Yes, sir."

It will be thus observed that this witness swears that the sills did not break squarely in two, but nearly so. He likewise says that the two outside sills were doty and unsound, but does not state to what extent and states that they

were painted over, and appeared to be sound on the outside. He likewise says, that the two inside sills were unsound, but does not say to what extent, but concedes that he saw these defects by looking at the sills, as they were then exposed to view, tilted to one side, after the wreck, and after the car was dismantled.

He likewise saw the defects by looking at the freshly broken places. He does not say, nor was he asked, whether any defects were seen, or could have been seen in any other portion of the car outside of those places disclosed by the fresh breaks themselves.

Witness Ashcraft, likewise, did not testify that the sills broke squarely in two. His testimony is as follows: "Q. How had those sills broken? A. ·They had all pretty near broken in two. Not square in two." It will thus be seen that he emphasizes the fact that they did not break squarely in two. The learned judge quotes from his testimony as follows: "Q. The sills of that car were rotten . . . They had, I never examined closely, but a person could see. They had all pretty near broken square in two, short in two."

It will be seen that the words "not square in two" were omitted from the quotation.

This witness testified: "How many sills did you look at? A. I paid more attention to two inside sills; they were the most rotten. Q. Was any portion of them unsound? A. Well, I couldn't say whether they were or not. Q. You don't know whether there was only a portion of them rotten or not? A. No, sir. Q. You can not say how much was rotten? A. No, sir. Q. The outside ends were painted over? A. Yes, sir."

The same witness testified further: "Q. The outside part, wasn't that painted over? A. Yes, sir. Q. Wasn't that sound on the outside? A. It was hid with the paint." The same witness further testified: "Q. The only

thing that you did look at, concerning the whole wreck, was the sills? A. Yes, sir."

Now this witness saw the car dismantled, saw the sills exposed to plain view after the wreck, and yet could not tell what part of them was rotten and what not. He confesses that he noticed no other part of the car, except the sills; and admits that the two outside sills were covered with paint. Here then was this witness who swears that the sills were not broken squarely in two, stating that he saw the two middle sills after the wreck, by looking at the freshly broken places, and then does not and could not tell whether any defects of any size or consequence existed in regard to even these two sills.

The next witness referred to was Thomas Conway. His testimony is quoted as follows: "A. We walked around the wreck to see what was the cause of the wreck." Also the following is quoted: "It broke square off, and fell down, I could not call it rotten wood, but bad wood."

This witness, in saying that the sills broke squarely off, was referring to the rear portion of the U. L. car, which had plowed along on the ground, and must necessarily have broken some of the sills after the wreck occurred. He testified as follows: "Q. You didn't examine the part next to the tender? A. No, sir; I didn't."

This same witness further testified: "A. I couldn't hardly tell of course, whether it was an off break or wasn't."

It will be noted that this witness does not claim that the car or any portion of it, was rotten. In reference to the sills breaking squarely off, it is not surprising that those under the rear portion should have been found in this condition, as the car must necessarily have plowed along on the ground for some distance, after it broke. This does not tend to prove that the sills were broken squarely when the car first came down.

This witness further testified, in reference to the sills: "Q. Wasn't it oak? A. I guess it was oak.

"Q. It was hard wood? A. It was hard wood some-time; but didn't look very hard then.

"Q. It was made out of hard wood then? A. It was made out of hard wood."

He further testified: "Q. These sills were all that you investigated? A. Yes, sir; that's all that I noticed."

The next witness referred to by the court was Philip Lehei. The testimony of this witness is quoted as follows: "A. I saw the car on the track, loaded with flour. I looked at the car; the car was rotten, the sills of it, and was worm-eaten. The car dropped right down on the track."

It will be observed that this witness did not examine that part attached to the engine and tender, but simply the rear portion He testified as follows: "Q. You didn't see that part attached to the tender? A. Yes, sir; but didn't examine it."

Said witness further testified: "Q. How many sills? A. I couldn't see the sills under the car; I saw the two outside ones. Q. Were they painted? A. Yes, sir. Q. The wood was better on the outside than the inside; the wood next the paint was all right? A. Sound a little."

Said witness further testified: "Q. How could you tell it was rotten when it was broken? A. You could see from the inside. Q. What was on the outside? A. Paint; dirty looking."

This witness further testified: "Q. What part of the car did you examine? A. That is all. Q. Then you examined these sills? A. That's all."

It will be likewise observed that this witness was speaking of the rear portion which had plowed along, and was describing simply the two outside sills, which he saw after the wreck, and could then see they were defective by looking at the fresh breaks alone. He concedes that these sills were

painted on the outside, and that he discovered the defects mentioned by looking at the inside or freshly broken places. He likewise does not undertake to say whether the defects which he saw, were merely nominal or otherwise. In other words, he has stated no facts, from which the court or jury, can have any idea as to the extent of the defects complained of.

The next witness referred to, in the opinion, is J. S. Settles, for plaintiff, whose testimony is quoted as follows: "A. The timber was doty and looked to me like it was rotten; that was the appearance to me."

It will be observed that this witness swears, that the car did not break squarely in two. He testified as follows: "A. The car was broken in two; it broke at the west door, and came pretty near to the other door; wasn't in the middle exactly, the rails broke in two and the car went down." This witness examined that part of the car attached to the engine and tender.

He further testified as follows: "Q. Did you examine the timber of that portion that was attached to the tender? A. Yes, sir."

He further testified: "Q. Which part of this portion attached to the tender did you say was unsound? A. Stringers or rails; stringers on each side of the car. Q. Sills, you mean? A. Yes, sir. Q. Those running along the side of the car? A. Yes, sir. Q. Bottom of the car? A. Yes, sir. Q. How many were there of these sills under the bottom of the car? A. I don't know how many. I noticed the two on the outside. Q. Were they painted? A. The outside of them was."

Said witness further testified: "Q. What part of it did you say was unsound? A. Outside sills; we call them stringers. Q. How could you tell? A. I could see where they were broken; they were doty; I would call them rotten.

VOL. 150 mo—14

Q. You could tell by seeing these broken places? A. Yes, sir. Q. They were unsound toward the middle of these sills? A. Yes, sir; unsound where broken. . . ."

Said witness further testified: "Q. The question I ask you is, whether or not the rotten part of this sill wasn't in the middle? A. In the middle and toward the middle of the car."

It will be observed that this witness, confessedly, examined the two outside sills alone and no other portion of the car. He concedes that these two sills were covered with paint, and likewise admits that he concluded they were unsound and doty by looking at the freshly broken places, and arrived at this conclusion by what the breaks themselves alone disclosed. He also entirely fails to say whether these defects were only nominal or to what extent they appeared. Such testimony as this, would throw no light on the question as to whether the inspectors could have discovered any defects, because, they were, as described by these witnesses, latent, and could not be discovered or seen until the car was broken down, and then only by an examination of the fresh breaks themselves.

The next witness referred to by the court was Richard Lafferty, for plaintiff. His testimony is quoted as follows: "A. I looked over the wreck to see what caused it, and in looking in this car, I seen that the inside sills was doty and rotten, and had broken pretty square off."

It will be observed that the court simply quoted a part of his testimony, in regard to the sills breaking squarely off.

Said witness further testified on this subject: "Q. I asked you whether it was a square break or diagonal? A. Those two inside sills, was square break. Q. But the whole car? A. The whole car went diagonal."

This testimony shows that only two of the sills broke squarely across, and that the remainder of the car broke diagonally. This witness further testified: "Q. Tell the

jury exactly, and show them exactly the position of the hind end of the broken car? A. The hind end of that freight car was setting almost on the track, while the forward end was shoved to the southwest."

This witness further testified: "A. The outside sills are always covered with the outside of the car outside."

Said witness further testified: "Q. The unsoundness was at the place that was broken? A. Yes, sir. Q. You could tell that by looking at the broken places? A. Yes, sir. . . . Q. With reference to the sills? A. They seemed to be sound; wasn't broken any way so you could say they wasn't sound."

This witness further testified: Q. It was fresh broke, you could tell that by looking at it? A. Yes, sir."

The substance of the testimony of this witness is, that the car broke diagonally; that the outside sills were painted and covered with the car; that the two inside sills were doty at the freshly broken places, and as shown by the breaks themselves. In other words, if you leave out of consideration the breaks, and consider the car as it was before his testimony shows that no defects were observable.

He likewise fails entirely to describe the extent or size of any defects, or to show what effect they had upon the strength of the car.

From these recited facts it appears that there is nothing in the testimony of this witness, which discloses any defects that a car inspector, in the exercise of ordinary care, with the car standing in the train, could have discovered. The witness saw only what he mentioned, by looking at the car dismantled, and by an examination of the fresh breaks alone.

The only other witness referred to by the court, on this subject, is John Downey. It is said by the court, that he testified that the car broke square across, and that it looked rotten where the break went through. But an examination

of the testimony of John Downey, will disclose that he swore that the sills along the side were sound.

Said witness testified as follows: "Q. Did you examine the timbers of that car so as to state whether it was rotten or otherwise? A. I didn't examine them; I noticed the car looked tolerably new; the timbers looked pretty sound. Q. State to the jury whether or not you noticed any of these sills; state whether they were rotten or otherwise? A. No, sir. The sills looked tolerably sound. didn't look rotten."

The witness then testified, as said by the court: "Q. You did observe that this car was broken in two? A. Yes, sir. Q. Square across? A. Yes, sir. Q. Did it look rotten where the break went through? A. Yes, sir."

It will be further observed that this witness, on further examination, says that the rotten places which he saw, were in reference to the cross sills, running crosswise of the car, that he discovered this by looking at the breaks themselves.

This testimony shows that the sills complained of were apparently sound. The witness did not undertake to describe any defects which were discoverable or could have been discovered, as the car stood prior to the accident. Those defects which he did see, were disclosed by the breaks found after the car was wrecked. He likewise fails entirely to describe the nature or extent of any of these defects, or to say what effect they could have had upon the car in question.

The foregoing is all the testimony mentioned by the court, to sustain the verdict below, and is all that could possibly have been quoted in favor of the verdict.

On the other hand, all the testimony introduced by the defendant, as well as the former history of the car, and the physical facts, disclosed that this car was a comparatively new one, and in a reasonably sound condition. It likewise shows

that there was nothing which could have indicated to an inspector, or any other reasonable person, examining the same, that there was anything wrong with the car, in any manner whatever.

In concluding this testimony, I agree with counsel for defendant in saying that all the testimony offered by plaintiff concerning the defects, was in reference to the four sills, or two outside and two inside ones. The undisputed evidence of plaintiff shows, that the two outside ones were covered with paint, and could not by ordinary inspection, have been examined by the inspector, so as to have observed the defects which were pointed out by the witnesses, after the car was'wrecked in plain view, and as it was shown by the fresh breaks. On the other hand, every witness for plaintiff, who described the defective condition of the two middle sills, also admit that they discovered these defects by an examination of the car, after the wreck, with the car dismantled, with the sills in plain view and that such breaks were only observable by an examination of the fresh breaks themselves.

It will likewise be conceded, upon an examination of the record, that not a witness has testified to the nature or extent of a single defect mentioned.

Can this court say, upon such general testimony, under such circumstances, that the jury had the right to infer that these defects were sufficient to render the car unfit for use, when the evidence does not show whether they were the size of a pin head, or otherwise. In other words, as the burden of proof was upon plaintiff, after the presumption of law being that the inspectors had done their duty, he was bound to show such defects as would reasonably render the car unfit for use. It is therefore asserted that there is an entire failure of proof in respect to this matter, and aside from the overwhelming testimony and physical facts, produced by the defendant, there was a signal failure of proof upon the part of plaintiff to make out a *prima facie* case.

Again, after a thorough examination of the record, I have been unable to find where a single witness has testified, that he saw a single defect or unsound place in the car, outside of those disclosed by the freshly broken sills, and at the places where broken.

Nor able to find, where a single witness was ever asked to point out any other defects in the car, except those as shown by the fresh breaks after the wreck, yet, upon this testimony, the court has erroneously held, that the jury, upon mere assumption, had the right to find that defendant's inspectors, as well as the others, who must have examined this car, had failed to perform their duty, when not a single witness has ever testified to any particular act, or failure upon their part.

In this connection I desire to call especial attention to the case of Railroad v. Bates, 45 N. E. 109, and following, where the questions involved were similar to those in the present case, and where the Supreme Court of Indiana, in an elaborate opinion, delivered by MONKS, C. J., said: "The special verdict shows that appellant received, a car from another company at Frankfort, Ind., for transportation over its lines, and that appellee was injured while attempting to couple the same to a locomotive on appellant's road. The first question presented by the motion for a judgment on a special verdict in favor of appellant is as to the liability of railroad companies to employees for injuries occasioned by a defect in foreign cars, received only for transportation over its lines. . . . The inspection which a company is required to make of such a car is not merely a formal one, but should be made with ordinary care; that is, the inspection should be such as the time, place, means, and opportunity, and the requirements and exigencies of commerce will permit. If the company has used ordinary care to secure competent inspectors, and inspection is made with ordinary care, under the circumstances, taking into con-

sideration the time, place, means and opportunity for inspection, and the defects, if any, are discoverable, are repaired, or due notice thereof given to the employee, the duty resting upon the company is discharged.

"It is not liable for injuries caused by hidden defects, which could not be discovered by such inspection as the exigencies of the traffic will permit. [Railroad v. Fry, 131 Ind. 319.] The company receiving such foreign car is not bound to repeat the tests which are proper to be used in the original construction of the car, but may assume that all parts of the car which appear upon ordinary examination to be in good condition, are in such condition. [Ballou v. Railroad, 54 Wis. 257; 11 N. W. 559.] It would seem that, if such car were old, dilapidated, or obviously defective, ordinary care would require a more careful inspection than if there was nothing unusual in its appearance. [Railroad v. Fry, 131 Ind. 327; 28 N. E. 991.]

"A railroad company is not negligent in receiving and passing over its lines cars different in construction from those owned and used by itself, if the same are not so out of repair or in such a defective condition as can be discovered by ordinary care. [Baldwin v. Railroad, 50 Iowa 680; Railroad v. Flanigan, 77 Ill. 365; Kohn v. McNulta, 147 U. S. 238; 13 Sup. Ct. Rep. 298, and cases cited.] . . .

"Appellant insists that the special verdict does not find facts from which the court can say that the inspection made was not such as is usually made by ordinary careful and prudent inspectors, under like circumstances; and that, therefore, as there is no finding of facts showing the want of ordinary care on the part of appellant, the judgment should have been rendered on the verdict in favor of appellant. The purpose of special verdict is that the jury may find the facts within the issues made by the pleadings, and the court

then declares the law thereon. If the special verdict includes findings of evidentiary facts, conclusions of law, and matters without the issues, the same are to be disregarded by the court in applying the law to the facts found. That part of the special verdict essential to the determination of this question, is as follows: 'Thirteenth. When standing upon the track, the drawbar and couplings of said oil tank car were apparently in proper position, and in good repair, and the defects and lack of repair were not observable to said Douglas, nor did he have any notice or reason to think that said drawbar or couplings were in any way insufficient or out of repair. They could only have been ascertained by close inspection under the car. . . . Fourteenth. At said station, Frankfort, the defendant maintained a resident car inspector, whose duty it was to inspect all cars of defendant and of other companies before placing them in the trains of defendant at said station. That said inspector did inspect said car, but only superficially and hurriedly, by looking it over, without tools or other manual tests, occupying not to exceed five (5) minutes in said inspection, and failing to discover the need of repair of said drawbar and attachments. That to have made an efficient and proper inspection thereof would have required not less than fifteen (15) minutes; and, with no other inspection, said car was ordered into said train. The defective condition of said drawbar and attachments could have easily been discovered by a reasonable and ordinary inspection thereof by said inspector if competent to make the same, but said inspector did not make the same, and it has not been shown by the evidence that said inspector was sufficiently skilled and competent to make the same.' This court can not say, as a matter of law, that the car could not have been inspected properly in less than five minutes, or that it was necessary to use 'tools or other manual tests.' Neither are there any facts found from which we can determine whether the standard of inspection designated as an

efficient and proper inspection thereof, is the one required by the law. In making an inspection, it is the duty of the inspector to use the usual and ordinary tests, and such tools as persons of ordinary prudence use, if any, under like circumstances. No man is held to a higher degree of skill or care than a fair average of his trade or profession, and the standard of due care is the conduct of the average prudent man. If the inspection is made in the usual and ordinary way, the way commonly adopted by those in like business, it can not be said that it was done negligently. In determining whether an inspection was made with ordinary care, a jury can only find facts showing whether the same was made in the usual and ordinary manner, the one commonly adopted by men of ordinary care and prudence, engaged in the same business, under like circumstances. If it were so performed, it was made with due care, and a jury can not be permitted to say that it was negligent.

"They can not be allowed to set up a standard which shall, in effect, dictate the custom or control the business of a community. [Titus v. Railroad, 136 Pa. St. 618; Ship Building Co. v. Nuttall, 119 Pa. St. 149; Tuttle v. Railroad, 122 U. S. 194; 7 Sup. Ct. Rep. 1166.]

"The finding 'that to have made an efficient and proper inspection and examination thereof, would have taken fifteen minutes' is a mere conclusion.

"The standard thus fixed by the jury may be predicated upon the proposition that such searching and critical inspection must be made as would insure absolute safety to the employees. This, as we have shown, is not required. Facts, not conclusions, must be stated. The special verdict should state such facts as would show whether the inspection made was such as is usually made under like circumstances by inspectors of ordinary care and prudence, and this would include all facts showing whether the inspection was such

as the time, place, means, opportunity and the requirements and exigencies of the traffic will permit.

"The special verdict does not state any facts showing that the car inspector was incompetent. Appellant was not required to prove that the car inspector was 'sufficiently skilled and competent' to act as inspector at Frankfort. The presumption in this case is that he was competent until the contrary is shown. [Railroad v. Tohill, 143 Ind. 56; 41 N. E. 709-711; 42 N. E. 352; Railroad v. Duel, 134 Ind. 156-160; 33 N. E. 355, 356, and cases cited.]

"The presumption is that appellant exercised ordinary care in the selection of the car inspector with reference to fitness and competency, and that the car was inspected with ordinary care; that is, the inspection was such as the time, place, means and opportunity and requirements and exigencies of commerce would reasonably permit. Disregarding the improper matters contained in the special verdict, the facts set forth do not overcome or contradict this presumption.

"It follows that the court erred in rendering judgment in favor of appellee."

The above case, from which I have just quoted thus at large, in the clearest manner possible, declares the law applicable to the present case.

The inspector for the defendant at Atchison in answer to plaintiff's question, swears as follows:

"Q. How much time do you spend in inspecting cars? A. From 5 to 25 minutes."

"Q. The 25 minutes examination is principally on cars which you find something wrong? A. Mostly foreign cars."

As testified to by Conductor Butts, he saw the inspector at Kansas City inspecting the car in controversy. Now it will be observed that no one claims or testifies, that either of the inspectors did not take sufficient time to examine this car, nor that they did not perform their duty in the usual and

ordinary manner. No one points out anything which they omitted to do, that might have been done, nor has a single witness testified to a single defect which the inspectors, by ordinary care, and without making tests to discover hidden defects, could have seen by an examination of the car as it then stood. With the presumption of law, that these two inspectors had performed their duty, with the presumption of law that the car was inspected before it left St. Louis, and by the teamster of Mr. Elder, and as the car was comparatively new, and had only been repaired eighteen months before and had gone over the same track less than a week before with a larger load, with a carrying capacity of 60,000 pounds and having only 30,000 pounds at the time, it is simply impossible to say under such physical facts and testimony as heretofore shown, that there is a scintilla of evidence upon which the jury could find that this car should have been pronounced unsound and unfit for use, when it had been used under the conditions aforesaid.

If this is not mere conjecture, then what would you call it? In the case just cited the special findings of the jury might have been drawn from the testimony, yet, it was held in the case *supra,* that they did not warrant a recovery on the charge of negligence against the inspector.

The case *supra* presented a much stronger one of negligence against the inspector than the one at bar, for it was said he made a superficial examination and did not spend sufficient time to make the examination. In the case at bar there is no evidence that the inspectors or either of them, failed in any particular or in respect to that which was usual or ordinary, the court, in the most emphatic language instructed the jury that the presumption of law was that the inspectors had performed their duty. The burden of proof devolved upon plaintiff, and it was required of him, by affirmative evidence, to show that the inspector had failed to perform his duty, and that the injury resulted therefrom.

There being a signal failure of proof upon this branch of the case, I think a rehearing should be granted.

## V.

Conceding for the sake of argument that I have erred in matter contained in previous paragraphs, in respect to the rapid rate of speed at which the train was running, causing the injury. Assuming likewise that the evidence authorized the jury to find that said car broke down before it left the track; and, assuming that the jury had the right to infer from the testimony of the witnesses heretofore set out, that these defects existed in the sills, as testified to by them, yet the proposition again recurs as to the extent of the defects pointed out by the witnesses. I may also waive, in this connection, the proposition that there is not a word of testimony that any of said defects were discovered, or could have been discovered, at any other places than as disclosed by the fresh breaks alone. The case was submitted to the jury with the right to draw any inference which might be legally drawn from the facts shown, yet they had no right to draw any inference, not warranted by facts.

Concede therefore, for the sake of argument, that the defects existed as pointed out by the witnesses, which were discoverable at the freshly broken places, and still there is nothing in this record to show that either of said defects rendered this 60,000 pound car unsafe to carry 30,000 pounds of freight, when it was comparatively new; had gone over the same road a week before with 31,800 pounds of freight, and had come back in safety over the roughest portion of the road yet no defects had ever been noted.

Could the jury, without any evidence upon the subject, as to the nature or extent of the defects, without any experience or information upon the subject, draw the inference that these skilled inspectors and car experts had violated their duty, in regard to the exercise of ordinary care, in

permitting this car to pass, even if they had discovered all those defects which were discoverable, before the wreck occurred, and as testified to by the witnesses. I search this record in vain for a syllable of testimony, which indicates in the least that any of these defects could have been known to the inspector, but, assuming that those testified to had been known, what, we ask, was there in the record to indicate to an experienced railroad man that he should condemn the car, under such circumstances? I think that judicial notice may be taken of the fact that all cars, after they have been subjected to the inclemency of the weather for a few years, must necessarily, to some extent, become somewhat worn and out of repair, and yet, if the former opinion is to stand, the railroad company, instead of being required to exercise ordinary care, towards its employees in respect to furnishing safe machinery and appliances, would be compelled to stand absolutely as an insurer, and this court in effect so holds.

I am unwilling to go to this extent, and aside from the other questions heretofore discussed, think there was a signal failure of proof upon the part of plaintiff, to make out a *prima facie* case, which required of the inspectors the duty of rejecting this car, in making up the train, even with the defects pointed out after the wreck, and as disclosed by the fresh breaks when the car was dismantled as aforesaid.

In the opinion of the court, we find the following language: "I quite agree with counsel, that $12,000 would have been ample compensation to plaintiff for the injuries sustained and would require a remittitur to that amount, if it were allowable." . . . The circuit court approved the verdict and we can, under the circumstances, do nothing but affirm the judgment."

It is likewise said in the opinion: "Counsel (for plaintiff) had in mind, the law, as it then existed, that this court would require a remittitur in case the verdict was excessively large."

But in this connection, the suggestion may be made that the court below, likewise, had in view the law, as it then stood, that the Supreme Court would require a remittitur, if it saw fit to do so. That rule of law has been settled from time immemorial, in this State, that when a case is appealed to the appellate court, it must be tried upon the same theory on which it was tried in the court below. (See authorities cited under proposition one of this opinion.)

This case was tried in June, 1894, and a transcript filed in this court on the twelfth day of August, 1894. When the transcript was so filed, the decision of this court, in the case of Furnish v. Missouri Pacific Railway Co., as well as the case of Burdict v. the same defendant, was in force in this State, which permitted this court, when a verdict was excessive, to require a remittitur.

After the transcript was filed in this court, the latter adopted the rule as declared in the case of Rodney v. Railroad, 127 Mo. 676, on the nineteenth day of March, 1895, repealing the former rule, which had been in force for years prior thereto, and then held that this court was powerless to require a remittitur.

It is here suggested that the court has placed itself in the attitude of adopting a rule, and then giving it a construction retrospective in its operation to the injury of the defendant.

If the cause is to be tried upon the same theory in which it was tried below, then the rule, finally adopted in the Rodney case, should only have been applicable to those cases which were tried in the court below, after the rule had been changed by this court.

In this connection, however, I desire once for all, to place myself upon record, in respect to this question of remittitur. Whenever a record discloses a state of facts from which the court can say that the ends of justice require a remittitur, then in our opinion, the court judicially determines that the

appellant has not had a fair and impartial trial under the laws of our State. It is untenable to assert that a remittitur will not be required, because we have not the right to do so, and at the same time assert as in the case at bar, that injustice has been done, by returning a verdict for $3,000 more than ample compensation, and that we are powerless to grant any relief. The true rule ought to be, when the record shows a state of facts, from which this court can say, that injustice has been done, and that a larger verdict has been returned than just compensation and the ends of justice require, the defendant has not had a fair and impartial trial and it then becomes the duty of this court, in order that justice may be done, to remand the case for a new trial. If we can not, in a case like this, remand it, for that reason, then where can you mention a case to which the rule should be applied? The entire court, upon the very face of this record, concedes that the plaintiff is recovering $3,000 with interest, more than that which is admitted to be ample compensation.

It is likewise said, that if it were allowable, a remittitur would be required. If this is not then, a judicial declaration that injustice has been done the defendant, and that the verdict must have been either the result of partiality, passion or prejudice, then what would you term it? To say the least, the rights of defendant, confessedly, have been violated, and yet, it is told by this court, that it is without a remedy.

(a)  In respect to that part of the opinion heretofore quoted, in which it is said, we "would require a remittitur to that amount, if it were allowable" I desire further to say, that the opinion, as it thus stands, is absolutely in conflict with the decisions throughout the country as well as the very maxims of the law. It will be found from the very earliest history of the courts, that they have uniformly amplified their jurisdiction to meet the requirements of justice whenever occasion demanded.

It is asserted in Broom's Legal Maxims (8 Ed.), 80, that: "It is the duty of a judge, when requisite, to amplify the limits of his jurisdiction." (*Boni Judicis est ampliare jurisdictionem.*)

The same rule is clearly followed and announced in its broadest terms by Judge ELLIOTT in his recent work on Appellate Procedure, in section 21, as follows: "It is inconceivable that a high court of justice, such as an appellate tribunal, may not, upon an investigation of the record, so frame its judgment as to prevent the defeat of justice by technical and arbitrary rules. The denial of this right involves the affirmation that the highest courts can not award justice, and this conclusion can not be vindicated, since the underlying and sovereign principle is that the right of appeal insures to litigants who have obeyed the substantive rules of law and conformed to the rules of procedure a judgment awarding them justice under the laws of the land. It must be true, therefore, that a high appellate tribunal may deliver and enforce a judgment that will prevent wrong and award justice to the parties entitled to it." The rule of law so clearly announced by Judge ELLIOTT, *supra,* appeals to reason as well as to common sense.

This is what one of the most learned luminaries, who ever sat upon the bench in this State, said upon the question involved, in the case of Goetz v. Ambs, 22 Mo. loc. cit. 172: "As a new trial will be granted on account of the excessiveness of the damages, we deem it inappropriate to make any comments on the case. Upon looking over the record, we are satisfied that the ends of justice will be subserved by granting a new trial; although the injury sustained was a serious one, we do not think the circumstances warranted so heavy a verdict."

In the case of Whitsett v. Ransom, 79 Mo. loc. cit. 260, it is said: "The court told the jury in one of the instructions, that if defendant willfully and in anger spat in

plaintiff's face, they should find for the plaintiff,. and yet this jury went out, under the sanction of an oath, and came back with a verdict for defendant. Such a trial is a travesty on justice, and a mockery of the courts. I (Judge Philips) yield to no one in my reverence for the right of trial *per pais,* as Blackstone calls it, and due respect for the proper domain of jurors. But the courts owe a duty of paramount concern to the cause of good government and orderly society. Under a sense of that obligation we reverse the judgment of the circuit court and remand this cause for a new trial, if the plaintiff so desires."

In Garrett v. Greenwell, 92 Mo. loc. cit. 125, this court again said: "Looking at all these things, it is a matter of profound surprise that the jury, with all this evidence before them, could have found as they did. But, inasmuch as they have done so, our duty, under the rule announced in the cases of Whitsett v. Ransom, 79 Mo. 258, and Spohn v. Railroad, 87 Mo. 74, is clear, and so the judgment is reversed and the cause remanded."

In the case of Caruth v. Richeson, 96 Mo. loc. cit. 192, Judge BLACK, in delivering the opinion of the court, said: "This court rarely interferes with the verdict of a jury where there is any substantial evidence to support it, though the trial court has a large discretion in the matter. (Cases cited.) But in extreme cases this court must and will interfere, and that too whether the verdict be for plaintiff or defendant."

In the case of Spohn v. Railroad, 87 Mo. loc. cit. 84 and 85, it is said, "a proper administration of the law demands a new trial." And it was granted in the case.

In Hunt v. Railroad, 89 Mo. loc. cit. 609, Judge RAY said: "Section 3776, Revised Statutes of 1879, provides that: 'The Supreme Court in appeals or writs of errors shall examine the record and award a new trial, reverse or affirm the judgment or decision of the circuit court, or give such

judgment as such court ought to have given as to them shall seem agreeable to law.' In reversing the judgment as to one of the defendants, and affirming it as to the other, as we have done in his case, we think we have hereby given such judgment as the lower courts under the facts and the law of the case, ought to have given. In a case like this the ends of justice do not require that the whole case should be reversed and remanded, for further proceedings. In numerous instances this court has modified and affirmed judgments as seemed to it agreeable to law and justice."

In the case of Scott v. Smith, 133 Mo. 623, Judge MAC-FARLANE, who delivered the opinion in the case at bar, cites with approval, a portion of Judge SCOTT's opinion in Stout v. Lewis, 11 Mo. 439, as follows:

"The case is different when the court below refuses to interfere. There the party is remediless, and cases may arise where this court will interpose. . . . These motions are addressed to the sound discretion of those courts, to be liberally exercised in furtherance of justice. A wise judge has said, that it is not alone sufficient that justice be administered, but it must be administered in a manner satisfactory to suitors."

## VII.

In addition to the elementary principles of law heretofore recognized by this court, it is proper to advert to section 2304 of the Revised Statutes 1889, which, in express terms, authorizes this court, when the ends of justice require it, to reverse or remand the cause. It reads as follows: "The Supreme Court . . . shall examine the record and award a new trial, reverse or affirm the judgment or decision of the circuit court, or give such judgment as such court ought to have given, as to them shall seem agreeable to law." What more should be asked in the way of conferring power

upon this court to dispose of a case, in order that the ends of justice might be observed thereby, than that which is given in the statute just quoted?

Speaking for myself, I can not escape the conclusion that the jury, in this cause, were not only actuated by sympathy, or prejudice in regard to the amount of the verdict rendered, but likewise as to the merits of the controversy.

As heretofore shown, the overwhelming testimony upon the merits of the case is with the defendant.   The verdict stands without any legal evidence to support it, and yet, this jury, upon such facts, with plaintiff's counsel in his closing argument, appealing to them not to return a verdict for more than $12,000 returned one for $3,000 more than ample compensation, and also more than this court, upon the face of the record, says is adequate; yet, I am told that this court is powerless to grant any relief.   If it is not granted, it is because the judges of this court refuse to exercise the power conferred upon them by plain law.   In my opinion, there is no middle ground.   This case, if not reversed without remanding, should, upon general principles, be reversed and sent back for new trial in order that the ends of justice may be attained.   ROBINSON, J., concurs in this opinion.

To the foregoing separate opinion filed by me in this cause on October 11, 1897, I deem it proper to add a few additional remarks; and I do this because of two additional opinions which have been filed in this cause, and which seem to call these remarks forth.

The one opinion holding that the demurrer to the evidence was properly denied and that there was no error as to the instructions; the other, that the evidence was clear and uncontradicted that the proper inspection of the car was made, and that while the jury had the right to disbelieve such testimony, yet that they could not disregard the instructions of

the court, "that unless they believed from the evidence that defendant failed to use ordinary care in inspecting the car, and in consequence thereof failed to discover its defective condition, if it was defective, they would find for defendant;" but that inasmuch as it was uncertain which they did, this uncertainty as to the basis of the action of the jury warrants the granting defendant a new trial.

The prominent and predominant question in this case is whether the court properly refused an instruction in the nature of a demurrer to the evidence. If this refusal was improper, then it is wholly immaterial what were the instructions given or refused, as such a ruling necessitates a reversal of the judgment.

Without adverting to other deficiencies in the evidence, I address myself therefore, to the main point in and of the evidence upon which this cause hinges, to wit, whether the car was properly inspected.

But this stands uncontradicted, so that it seems to me that if the jury have the right to disbelieve the evidence on the point mentioned, and their action was founded on such disbelief, then it stands to reason that in contemplation of law there was no evidence, and therefore, the jury was right in disregarding instructions which had no evidential basis on which to rest and it will be presumed that they acted by right and not by wrong, and consequently did not "disregard the instructions of the court."

But I maintain that the idea that the jury "without rhyme or reason" may arbitrarily disregard evidence which is based on well known probabilities and the daily experience of common life and is not unreasonable in its nature nor impeached nor contradicted, is at war with every principle which lies at the foundation of the law's proper administration. If a chancellor, trained and bred to the law with long experience on the bench decides a case contrary to the evidence, even if there be some conflict therein, or decides that

Oglesby v. Mo. Pac. R'y Co.

there is no evidence when we think there is, this court does not hesitate to reverse the decree, and will frequently enter in this court a decree for the unsuccessful party.

"On what meats has this our jury fed that it has grown so great"

that they may disregard the clearest and most indisputable and uncontradicted evidence, and their act pass unchallenged and without remedy?

And then the unsuccessful suitor though justly entitled to a verdict be blandly told, "the jury had the right to disbelieve your witnesses and they have done so;" if the utterance of such an edict does not affix the bar sinister upon the escutcheon of public justice, I know not by what words to express the name and nature of the confiscatory outrage.

But though this court has frequently made deliverances of the tenor and effect above noted, yet it has also far more frequently given expression to rulings wholly at variance with those deliverances. For instance, it has often said that if the evidence be undisputed the lower court may, without error, assume in an instruction the existence of such undisputed facts. [Hall v. Railroad, 74 Mo. 298; Fields v. Railroad, 80 Mo. 203; Barr v. Armstrong, 56 Mo. 577; Caldwell v. Stephens, 57 Mo. 589.]

Now what right has the court to assume to be true what the jury may immediately assume to be false and incontinently disbelieve?

We have frequently also declared that the trial court may direct the jury to find a verdict for a party in whose favor there is undisputed evidence. [Reichenbach v. Ellerbe, 115 Mo. 588, and cases cited.] How does this tally with the theory that the jury may absolutely disbelieve such undisputed evidence? Elsewhere, it is held that a trial court may, in proper circumstances, direct a verdict for either party. [2 Elliott, Gen. Prac., sec. 887, and cases cited.] This method of procedure has largely superseded the practice of

demurring to the evidence, and is as much a matter of right when demanded as a demurrer to the evidence.    [Ib.]

It is unnecessary for me to go into this subject more fully, since it has been so recently and exhaustively discussed by MARSHALL, J., in Gannon v. Gas Light Co., 145 Mo. loc. cit. 544, where the authorities in this and other States are reviewed with great elaboration.    So far as I am aware, no other State but our own has ever announced such a doctrine as that which I have condemned.

In the very recent case of May v. Crawford, decided in Division No. 1 of this court, the doctrine announced in the dissenting opinion in Gannon v. Gaslight Co., has been reaffirmed.    The opinion from which I have quoted does not discuss the point whether the trial court erred in denying defendant's demurrer to the evidence.    But it is quite plain to me that if, as is indisputably and uncontradictedly true from that evidence, that a proper inspection was had of the car, then the plaintiff has no case, and the demurrer to the evidence should have prevailed.    It was the clear duty therefore, of the lower court to have given an instruction in the nature of a demurrer to the evidence; and this view is abundantly supported by the opinion of BRACE, J., in Reichenbach v. Ellerbe, *supra.*

The opinion which goes in for affirmance of the judgment evidently feels the force of the undisputed evidence showing with convincing clearness that the car was properly inspected, and so by way of parrying that force asserts, that: "The manner of making those inspections was in evidence; from this it appeared that the inspector in Atchison inspected about 150 cars in a day and the Kansas City man inspected about 100 cars in a night.    This car passed through such inspections, and as the inspectors made no note of the car as they would have done if they had seen a defect, they presumed it was in good condition."

The evidence in this case, be it remembered, does not tell us how many cars can be properly inspected in a day, and so it seems this opinion attempts to fill the hiatus by taking some sort of judicial notice as it were, which without extraneous aid determines for itself, and of itself, and within itself, just what number of cars could receive the proper inspection within a given time. I hardly think that judicial notice can extend itself as far as that; nor do I think that the jury in the absence of evidence on the point in question could resort to their inner consciousness with the view to supply what the evidence failed to furnish.

The fourth paragraph of the opinion under review, discusses defendant's fourth instruction, to wit, that the law presumes "that defendant's servants did their duty in inspecting the car, and the burden is on the plaintiff to show that they failed to do so." After making the above quotation, that paragraph thereupon proceeds thus: "There is no such presumption in defendant's favor. On the contrary, when it appears that the servant is injured by a defective appliance furnished by the master, the burden is on the master to show that he exercised the ordinary care that the law requires."

This is the first time I have ever observed the existence of this familiar presumption denied.

In Lenox v. Harrison, 88 Mo. loc. cit. 496, it is said: "The subject of the favorable presumptions which are indulged in behalf of persons acting in an official capacity, especially after a long lapse of time has intervened, has been quite extensively discussed in Long v. Joplin M. & S. Co., 68 Mo. 422. In similar circumstances the like lenient presumptions are indulged in favor of persons who occupy no official station. Every one is presumed to govern himself by the rules of right reason and consequently that he acquits himself of his engagements and his duty. [1 Phil. Evid., Cowen & Hill's, notes, pp. 604, 605, sec. 10."]

Judge ELLIOTT in his excellent work on Railroads, when speaking of the point in hand, says:  "The presumption, in the absence of anything to the contrary, is that the company and its employees did their duty and complied with the law." [Vol. 4, sec. 1701.]

Elsewhere the learned author observes:  "Test of the employer's liability.   The mere fact that after the occurrence of an accident, defects are discovered in machinery or appliances, is not sufficient to fasten a liability upon the employer. The duty of the employer is to exercise ordinary and reasonable care, to provide and keep reasonably safe machinery and appliances, but he is not an insurer, so that he can not be held liable unless it is affirmatively shown that he was guilty of negligence.   The test of liability, therefore, is the presence or absence of negligence.   If there is no negligence there can be no liability, although there may be defects and the defects may be the proximate cause of the injury."   [3 Elliott on Railroads, sec. 1308.]   In the same connection it is said:   "The employee who seeks a recovery for personal injury has the burden of proving a negligent breach of duty on the part of the employer."   [Ib., sec. 1309.]

In another work of merit the law is laid down that: "The burden is upon the employee to establish not only that the appliances were defective, but also that the company was negligent in respect thereto. . . . . .   The mere fact that the appliances are defective is not sufficient to charge the master with liability for an injury resulting therefrom. It must also be shown that the master knew or ought to have known of the defect and negligently failed to repair it." [Wood's Law of Master and Servant (2 Ed.), sec. 335.]

These pertinent quotations suffice to show that there is such a presumption as that aforesaid; that the burden is not on the employer, as has been alleged, but on the employee, and that the mere fact that defects are discovered after an accident happens, does not fasten liability on the employer.

But in this case, as before stated, the evidence is uncontradicted that the proper inspection of the car was made. Everything that the law required at the hands of the master was done and properly done, and there is not a scintilla of evidence to the contrary. Where then and how then does the master's liability attach?

PER CURIAM: The foregoing opinions expressing the views of the different members of the court are ordered filed.

GANTT, C. J., and BRACE, J., concur with VALLIANT, J., for the affirmance of the judgment; BURGESS and MARSHALL, JJ., hold the judgment should be reversed and the cause remanded for a new trial; SHERWOOD and ROBINSON, JJ., hold the judgment should be reversed without remanding but in order to dispose of the case concur with BURGESS and MARSHALL, JJ., in ordering the judgment reversed and the cause remanded; GANTT, C. J., BRACE and VALLIANT, JJ., dissenting.